[Civ. No. 47354. Second Dist., Div. Three. Aug. 27, 1976.]

DAVID CARD et al., Plaintiffs and Respondents, v. COMMUNITY REDEVELOPMENT AGENCY OF SOUTH PASADENA, Defendant and Appellant.

**COUNSEL**

Graham A. Ritchie for Defendant and Appellant.

Telanoff, Bobrowsky,. Wallin & Dilkes, Peter L. Wallin and C. Edward Dilkes for Plaintiffs and Respondents.

**OPINION**

**COBEY, Acting P. J.**—Defendant, the Community Redevelopment Agency of the City of South Pasadena (hereafter Agency), appeals from a judgment that, among other things, declares invalid the city's ordinance purporting to amend an existing redevelopment plan for the Monterey Hills area in the city and awarding to plaintiffs' attorneys legal fees in the amount of $20,400.

The essential basis for the judgment of invalidity is that the city actually adopted a new redevelopment plan under the pretext of amending an existing one.[1]

The Agency principally contends that: (1) the action should have been dismissed for failure of the plaintiffs to fully comply with the procedure required in validation actions and because all irregularities in the redevelopment proceedings under review were cured by the Third Validating Act of 1973; (2) the trial court lacked the requisite constitutional basis for invalidation; (3) the award of attorneys' fees was improper.

*Background[2]*

The redevelopment plan for Monterey Hills Redevelopment Project No. 1, as adopted in 1959 by the city, was primarily a plan for the redevelopment of vacant land to upper income residential uses. At the time of the adoption of the challenged ordinance (No. 1644) on December 19, 1973, purporting to amend this plan, the Agency had virtually completed the original plan's implementation.[3] The purported amendments to the plan expanded for redevelopment purposes the boundaries of the original project area so as to include the city's downtown business area and an older residential area impacted by the proposed Long Beach Freeway and lying between the downtown business area and the boundaries of the original project.

The downtown business area constitutes one-third of the added area. The remaining two-thirds lies immediately west of the downtown area and east and northeast of the original project area. It is composed of older single family homes with occasional multi-family residential and

---

[1]The advantage of amending an existing redevelopment plan over developing a new one was that much more tax increment revenue thereby became available to the Agency pursuant to California Constitution, article XVI, section 16, and Health and Safety Code section 33670.

Since the word "amend" is not defined in the Community Redevelopment Law (Health & Saf. Code, § 33000 et seq.) and therefore has its ordinary meaning, the challenged amendments made to the Monterey Hills Redevelopment Plan were not in excess of the powers of the city council under this statute.

[2]These facts are taken from the trial court's findings of fact.

[3]The parties stipulated that as of December 1, 1973, the Agency still owned approximately 20 lots in the original redevelopment area, but by fiscal year 1968-1969 had repaid its loan and grant contract with the federal government and all its bonds.

■

commercial uses. It is bifurcated north-south by the proposed Long Beach Freeway. It is contiguous to but physically separated from the original project area by some steep hills that prevent vehicular and other traffic across them.

The proposed expansion in project area would not affect the original project area uniquely to that area as compared with the remainder of the city. The purported amendments actually constitute an entirely new and separate redevelopment plan and project of substantial magnitude, wholly different in concept, goals and territory from that of the original plan and project. The amended redevelopment plan represents an attempt through the use of the Community Redevelopment Law to increase commercial activity within the downtown business area and to cope with anticipated problems that the existence of the proposed freeway creates within the added residential area.[4]

### The Action Is Properly Before Us

■ As we have indicated, the Agency contends that this action should have been dismissed pursuant to Health and Safety Code sections 33500, 33501 and Code of Civil Procedure section 869, and that the trial court abused its discretion in permitting plaintiffs' tardy compliance with the just-mentioned statutes.[5]

Plaintiffs filed this action originally as an in personam taxpayers' suit pursuant to Code of Civil Procedure section 526a and in their complaint alleged that they were citizens, residents and taxpayers of the city and owners of real property assessed for taxes within the last year by the County of Los Angeles. The defendants originally named included the Agency, the city, the city council and the members thereof, the Los Angeles County Tax Collector-Treasurer and the Los Angeles County Auditor. The last two mentioned defendants were included because plaintiffs sought to enjoin their paying over to the Agency certain tax increment revenues.[6]

---

[4]The plan for the proposed revitalization of the downtown business area seems to be the result of thorough and exhaustive study. The addition of the freeway impacted area appears to have been, more or less, an afterthought.

[5]These Health and Safety Code sections refer to attacks upon a redevelopment plan and not to challenges to amendments thereto. But plaintiffs here challenge the redevelopment plan of the Agency as amended and, in any event, "[t]he greater contains the less." (Civ. Code, § 3536.)

[6]The Agency also challenges the standing of plaintiffs to sue, but plaintiffs clearly are interested persons within the meaning of Code of Civil Procedure section 863 in view of

As previously noted, the challenged ordinance was adopted on December 19, 1973, and plaintiffs' action was filed on February 14, 1974. Plaintiffs' action was therefore filed within the 60-day period specified in the aforementioned Health and Safety Code section 33500. It was not, however, filed in the proper form for a validation action in rem as permitted by the aforementioned Health and Safety Code section 33501 and as required by the aforementioned Code of Civil Procedure section 869. The summons originally issued was not in the special form enjoined and no publication thereof was made. (See Code Civ. Proc., §§ 861, 861.1.) Accordingly the Agency moved on July 8, 1974 (see Code Civ. Proc., § 1005.5) to dismiss the action.

At the time of the making of this motion the 60-day period within which a copy of the special summons should have been published and proof of publication filed had long expired. But Code of Civil Procedure section 863 expressly provides, in effect, that dismissal shall not occur if "good cause" for the failure to comply with these publication requirements is shown. This good cause exemption literally applies only to these publication requirements, but in *City of Ontario* v. *Superior Court,* 2 Cal.3d 335, 346 [85 Cal.Rptr. 149, 466 P.2d 693], our Supreme Court extended this exemption to a situation like the one before us—that is, where the plaintiff has not simply failed to comply with the publication requirements but has also failed to include in his complaint the allegations required for a validation action. Furthermore in *Ontario* our Supreme Court suggested that where a plaintiff seeks injunctive and declaratory relief, unavailable in a validation action—something which occurred in that case and also in this case—this circumstance may constitute "good cause" for noncompliance with the validation procedure. (*Id.,* at pp. 344-346.) Of course, in the earlier case of *Community Redevelopment Agency* v. *Superior Court,* 248 Cal.App.2d 164, 167-168, 170-175, 180 [56 Cal.Rptr. 201], another division of this court held that permitting tardy amendment of the summons and its subsequent publication was beyond the jurisdiction of the trial court in an action challenging, as here, the validity of a redevelopment plan for the reason that no good cause had been shown for plaintiff's failure to comply with the requisite validation procedure. In *Ontario, supra,* 2 Cal.3d at 346-347, this case was distinguished on factual grounds inapposite here.

We nevertheless believe that *Community Redevelopment Agency* is not controlling in this case. There the action involved was simply a

the fact that each was subsequently stipulated to be a citizen, resident and taxpayer of the city and "a person interested in the matter of the amendments to the redevelopment plans for the Monterey Hills Project No. 1."

validation action and nothing more, while here, as just indicated, plaintiffs sought specific in personam relief as well—namely, declaratory and injunctive relief.

In response to the Agency's aforementioned motion to dismiss the action plaintiffs filed a motion for relief under Code of Civil Procedure section 473 and included in their moving papers the necessary proposed amendments making the action a proper validation action. The trial court granted plaintiffs the relief requested on condition that publication of the summons in proper form be tardily made. In so acting, we think that the trial court did not abuse the discretion granted it by Code of Civil Procedure sections 473 and 863. We concede that neither the prior experience of plaintiffs' counsel in redevelopment litigation cited by him to the trial court nor the delay of over four months on the part of the Agency in raising this objection of improper procedure fully excuses plaintiffs' counsel from his initial noncompliance with a plainly mandated procedure and, further, that if the trial court had ruled otherwise on plaintiffs' motion for relief we would have left its ruling undisturbed. Seeking relief in personam under Code of Civil Procedure section 526a and seeking relief as well in rem pursuant to Code of Civil Procedure section 860 et seq., are not mutually exclusive remedies.

Nonetheless, as our Supreme Court pointed out in *Ontario, supra,* 2 Cal.3d at 347-348, the policy enunciated in section 473 to dispose of cases on their merits, where reasonable and just to do so, rather than upon technicalities of procedure and the further policy that appellate courts should not interfere with the exercise of discretion by trial courts, unless that exercise has been *plainly* wrong, dictate that we leave undisturbed the trial court's grant of relief to plaintiffs for their procedural default.

We turn now to the effect of the Third Validating Act of 1973 (Stats. 1973, ch. 388, p. 829 et seq.) upon the validity of the challenged redevelopment proceedings. The act was adopted on September 5, 1973, and became effective on January 1, 1974. It validates, among other things, all acts and proceedings taken before its effective date by any public body under any law for the annexation or inclusion of territory into such public body. The term "public body" in the statute expressly includes "Redevelopment agencies." Its validation of such acts and proceedings extends, however, only to constitutional limits and furthermore does not reach any such act or proceeding that was under challenge in any legal proceeding pending on January 1, 1974, or 30 days thereafter.

As previously noted, the action before us was not filed until February 14, 1974; therefore the filing of this action did not prevent the application of this special validating statute to the redevelopment proceedings before us.

The trial court concluded that the Third Validating Act did not validate the adoption by the city of the redevelopment plan as amended and that, in any event, the act was without curative effect upon the amendments and the proceedings leading to their adoption because in such proceedings all persons interested in the redevelopment project were deprived of due process of law.

The first of these conclusions apparently rests upon another conclusion, namely, that the word "territory" as used in the validating act refers to "territorial jurisdiction" as defined in section 33120 of the Community Redevelopment Law. This section provides that the territorial jurisdiction of a redevelopment agency of a city is the territory within the city's limits. Under this construction of the validating act then the only relevant changes in territory validated by it were changes in the territorial jurisdictions of redevelopment agencies. According to this construction the redevelopment proceedings at issue were not validated because they do not involve such changes in boundaries.

We do not agree with this unnecessarily narrow and strained construction of the word "territory" in the Third Validating Act. As just noted, the term "public body" as used in the act expressly includes "redevelopment agencies." Changes in the territory within which such agencies redevelop land uses may come about through changes in the boundaries of their plans and projects. If the Third Validating Act was designed to cover only changes in the territorial jurisdictions of these agencies, as defined in the aforementioned section 33120, the express inclusion of these agencies among the public bodies covered by the act would have been unnecessary. Accordingly, notwithstanding the awkward wording of certain of the language used,[7] we reject this construction adopted by the trial court because it renders a portion of the language of the act superfluous—namely, the express inclusion of redevelopment agencies among the public bodies covered by the act.

[7]We refer to the words "annexation or inclusion of territory into such public body." Literally interpreted, these words do not exactly fit changes in boundaries of redevelopment plans and projects.

There is no problem otherwise with the language of the statute. It expressly covers "[a]ll acts and proceedings heretofore taken" and thus covers all proceedings leading up to the adoption of the challenged redevelopment plan as amended.

The question remains whether the Third Validating Act of 1973, nevertheless, had any curative effect upon the redevelopment proceedings before us. It is settled law that unless the use of the statutory amendatory procedures in place of the statutory procedures for the formulation of a new redevelopment plan deprived those affected thereby of constitutional due process of law, the use of the amendatory procedures, even though used when they plainly should not have been,[8] was a deficiency cured by the Third Validating Act of 1973. Likewise, in such event, such use involved, in the language of Code of Civil Procedure section 866, error, irregularity and omission not affecting the substantial rights of the parties to the validation litigation and must therefore be disregarded. (*In re Redevelopment Plan for Bunker Hill,* 61 Cal.2d 21, 44 [37 Cal.Rptr. 74, 389 P.2d 538].) Consequently, we now turn to this constitutional law question.

### *The Due Process of Law Question*

The trial court found that by utilizing the statutory redevelopment amendatory procedures instead of the statutory procedures to formulate and adopt a new redevelopment plan, the city council and the Agency had omitted various requirements of the latter procedure. The trial court made very specific findings in this connection. The court found first that, in deciding to add the downtown business area and the freeway impacted residential area to the Monterey Hills project, the first step in redevelopment, that of picking a survey area, had been omitted. But the taking of this initial step is not made mandatory by the Community Redevelopment Law. (See Health & Saf. Code, § 33310.) Second, the city planning commission, in cooperation with the Agency, did not develop a preliminary plan or otherwise formally participate in the development of the amendments. (See Health & Saf. Code, §§ 33322, 33323.) But the Community Redevelopment Law again expressly permits both a redevelopment plan and changes therein to be approved by an agency without a report thereon from a planning commission. (See Health & Saf. Code, §§ 33347, 33453, 33455.) Third, no project area

[8]Joseph E. Coomes, Jr., an attorney representing redevelopment agencies, states "While no statutory standards exist for an amendment adding area to a project, the inclusion of a new area should bear a reasonable relationship to the goals and objectives of the redevelopment plan and should not be so unrelated to the original project area as to constitute, in effect, a new and different project." (Coomes, The California Redevelopment Process, prepared for the University Extension, University of California Seminar on California Style Redevelopment (Feb. 27, 1976) at p. 9.)

committee was selected as directed by Health and Safety Code section 33385 when a substantial number of low and moderate income families are to be displaced by a redevelopment project. But again consultation with such a committee in the development of a redevelopment plan is required only if such a committee exists (Health & Saf. Code, § 33347) and it did not exist before the amendments were adopted. Fourth, the notice and statements to the specified county officials and the affected taxing agencies provided in Health and Safety Code sections 33327 and 33350.1 were not given. But copies of the notice of the joint hearing of the Agency and the city council on the proposed amendments (including legal descriptions of both the boundaries of the original project area and of the area proposed to be added thereto and a general statement of the purposes of the amendments) were mailed by certified mail to the governing bodies of each affected taxing agency as required by Health and Safety Code section 33452. Fifth, published and individual notice to the affected property owners of the joint hearing upon the amendments was not given as specified in the new plan procedures. (See Health & Saf. Code, §§ 33349, 33350 and 33361.) But substantially the same notice contentwise was provided for a somewhat shorter period of publication—three weeks as opposed to four weeks (Gov. Code, § 6063)—as required by the aforementioned Health and Safety Code section 33452 of the amendatory procedures.[9] Sixth, before adopting the amendments the city council was not provided with the report required by Health and Safety Code section 33352 in the case of a new plan. Again, though, from our review of the materials furnished the city council at and before the joint hearing at which the amendments were approved, the information required in such report to the extent applicable was presented to the city council in various reports, brochures and in oral expert testimony. Consequently we must conclude, in view of the complete compliance with the notice and hearing requirements of the amendatory procedures and the substantial compliance with the like requirements of the new plan procedures (see *Sanguinetti* v. *City Council*, 231 Cal.App.2d 813, 818-821 [42 Cal.Rptr. 268]), that the use of the amendatory procedures instead of the new plan procedures did not deny to persons interested in the project constitutional procedural due process of law, i.e., constitutionally adequate notice and hearing.

---

[9]The property owners and those living within the project area, as proposed to be enlarged, received a pamphlet from the Agency partially entitled "This is Your City" and a letter explaining why the Agency was recommending the amendments to the plan.

The property owners did not receive, however, the express notice required by Health and Safety Code section 33350 that their property would be subject to acquisition by purchase or condemnation.

The trial court, though, also made findings which relate to substantive as opposed to procedural due process of law. The trial court found that in adopting the challenged amendments the city council failed to make the findings and statement on relocation required by Health and Safety Code section 33367, subdivisions (d)(8) and (e).[10] Instead the city council found only "[t]hat the Agency has a feasible method and plan for the relocation of families and persons to be temporarily and permanently displaced from having facilities in the project area, as amended."

It can be seen at once that the just-quoted finding of the city council with respect to relocation protection does not contain the specific assurances of adequate temporary and permanent replacement housing required in the findings that must be made in the case of a new plan. Furthermore the plan as amended lacks specifics on relocation and the city council apparently was not prese..ed with any information on the number of persons that might be displaced by redevelopment and how many of those persons were of low or moderate incomes. The city council did not receive a report of a relocation method or plan including the provision required by Health and Safety Code section 33411.1 "that no persons or families of low or moderate income shall be displaced unless and until there is a suitable housing unit available and ready for occupancy by such displaced person or family at rents comparable to those at the time of their displacement." (See Health & Saf. Code, § 33352, subd. (d).)[11]

---

[10] These subdivisions read as follows:

"(d) The findings and determinations of the legislative body that:

"(8) There are or are being provided in the project area or in other areas not generally less desirable in regard to public utilities and public and commercial facilities and at rents or prices within the financial means of the families and persons displaced from the project area, decent, safe, and sanitary dwellings equal in number to the number of and available to such displaced families and persons and reasonably accessible to their places of employment.

"(e) A statement that the legislative body is satisfied permanent housing facilities will be available within three years from the time occupants of the project area are displaced and that pending the development of such facilities there will be available to such displaced occupants adequate temporary housing facilities at rents comparable to those in the community at the time of their displacement."

[11] The plan as amended contains the following provisions with respect to relocation.

"*Relocation:* There will be a minimum of relocation activities carried out within the Project Area as it is anticipated that most conversions of residential structures will be on a voluntary basis carried out by the property owners. There is adequate standard housing within the surrounding areas and relocation activities will be spread over a period of several years. It is anticipated that relocation resources will be adequate since relocation activities will be so light. A present canvas of available single-family residential units within the city limits of South Pasadena and within the general vicinity appear most adequate to meet relocation needs."

"B.   *Relocation of Persons, Individuals and Business Concerns Displaced by the Project*

The trial court, after making certain further findings, then concluded in effect that the city's choice of the wrong procedure under the Community Redevelopment Law deprived all persons interested in the enlarged project of constitutional due process of law.[12]

We generally agree. The Third Validating Act of 1973 expressly provides that its effect "shall be limited to the validation of acts and proceedings to the extent to which the same can be effectuated under the State and Federal Constitution." (Stats. 1973, ch. 388, § 6, subd. (b), p. 833.) Code of Civil Procedure, section 866, a part of the general validation law, enjoins courts to disregard any error, irregularity or omission that does not affect the substantial rights of the parties. Our Supreme Court in *In re Redevelopment Plan for Bunker Hill, supra,* 61 Cal.2d at p. 44, held, in effect, that under essentially the foregoing statutory provisions the single inquiry that a reviewing court may make is whether the redevelopment proceedings reviewed deprive a party thereto of his property without due process of law.[13]

■ Due process of law in the substantive sense demands equality of treatment among those similarly situated. (See *Truax* v. *Corrigan* (1921) 257 U.S. 312, 332-333 [66 L.Ed. 254, 263, 42 S.Ct. 124, 27 A.L.R. 375]; *Bolling* v. *Sharpe* (1954) 347 U.S. 497, 499 [98 L.Ed. 884, 886, 74 S.Ct. 693]; cf. *Brown* v. *Merlo,* 8 Cal.3d 855, 861 [106 Cal.Rptr. 388, 506 P.2d

---

"1. *Assistance in Finding Other Locations* The Agency shall assist all persons, including families, business concerns and others, displaced by the Project in finding other locations and facilities. In order to carry out the Project with a minimum of hardship to persons displaced from their homes, the Agency shall assist individuals and families in finding housing that is decent, safe, sanitary, within their financial means in reasonable, convenient locations and otherwise suitable to their needs. The Agency is also authorized to provide housing inside or outside the Project Area for displaced Persons.

"2. *Relocation Payments* The Agency is authorized to pay out relocation payments and to provide relocation advisory assistance to all Project residents and business concerns that is in conformity with the adopted relocation plan and required or authorized by law."

[12]We do not find these further findings, which we quote immediately hereafter, persuasive of the conclusion reached.

"The adoption of a redevelopment plan for the added area, without complying with the procedures as aforesaid, substantially affects the rights of plaintiffs and all other persons interested in the matter in that a large area of the City has been subjected to redevelopment without the studies, appraisal and comment by governmental officials, project area residents and the general public required by law for the adoption of a new redevelopment plan or project; without providing the time required by law for the adoption of a new redevelopment or project to generate such input; and without giving prior consideration to the input required by law for the adoption of a new redevelopment plan."

[13]It would seem that validating statutes should be ineffectual to cure any constitutional infirmity, regardless of its kind.

212, 66 A.L.R.3d 505].) ▮ Here plaintiffs and others owning property or living within the added area did not receive the same relocation protection they would have received had proper redevelopment procedure been followed—that is, the procedure required in the formulation and development of a new redevelopment plan. They were thereby deprived of substantial property rights without constitutional due process of law in the substantive sense.[14] (See *Skelly* v. *State Personnel Bd.,* 15 Cal.3d 194, 207 [124 Cal.Rptr. 14, 539 P.2d 774]; cf. *Gray* v. *Whitmore,* 17 Cal.App.3d 1, 21 [94 Cal.Rptr. 904].) Accordingly Ordinance No. 1644 is invalid due to this constitutional infirmity in the proceedings leading up to its adoption and in its contents.

### The Award of Attorneys' Fees

▮ The Agency challenges the provision of the judgment awarding to plaintiffs' counsel attorneys' fees of $20,400 to be paid by specified taxing agencies proportionately from their respective shares of tax increment funds for the fiscal year 1974-1975 attributable to the aforementioned Monterey Hills Redevelopment Project No. 1.

The Agency has standing to make this challenge because under a judgment in another case called to our attention by the Agency

[14]Although plaintiffs did not allege in which part of the area added by the amendments they either lived or owned property, and under the plan no acquisition by eminent domain is to be made in the freeway impacted area generally for a minimum of 10 years and until a satisfactory method of financing such acquisitions have been approved by the city council, their living or owning property within the area added by the amendments subjects them to possible displacement upon the implementation of redevelopment. This being the case, they are liable to be injured by the absence of relocation protection and therefore have standing to raise the constitutional deficiency of the redevelopment proceedings and ordinance in this respect.

The history of redevelopment relocation both in the United States and California discloses a trend toward more and more relocation protection. (Housing Act of 1949, 42 U.S.C. § 1460; as amended by 42 U.S.C. § 1455(c) (1964); 42 U.S.C. § 1455(c)(2) (Supp. II, 1966); 42 U.S.C. § 1455(c) (1969); Community Redevelopment Law, Health & Saf. Code, § 33000 et seq. See, e.g., Health & Saf. Code, §§ 33352, added 1963, amended 1965; 33367, added 1963, amended 1965; 33411.1, added 1969.)

The reason for increased relocation protection is that adequate replacement housing for those displaced by redevelopment has become less and less available for a variety of reasons. (See Ronfeldt & Clifford, *Judicial Enforcement of the Housing and Urban Development Acts* (1970) 21 Hastings L.J. 317; Loeb, *The Low Income Tenant in California: A Study in Frustration* (1970) 21 Hastings L.J. 287; Hagman, *Urban Planning and Development: Race and Poverty—Past, Present and Future* (1971) Utah L.Rev. 46; Comment, *Judicial Review of Displacee Relocation in Urban Renewal* (1968) 77 Yale L.J. 966; Twenty Years After Brown: Equal Opportunity in Housing. Rep. of U.S. Com. on Civil Rights (1975); A Decent Home, U.S. President's Committee on Urban Housing (1968); Relocation: Unequal Treatment of People and Businesses Displaced by Government, Advisory Commission on Intergovernmental Relations (1965).)

(Community Redevelopment Agency of the City of South Pasadena v. Mark H. Bloodgood, Auditor-Controller of the County of Los Angeles (Superior Ct. No. 32034)) which we now judicially notice, the $30,000 balance presently remaining from the aforementioned tax increment funds is payable to the Agency unless we affirm the judgment before us.

The Agency attacks the award of attorneys' fees as both unauthorized and excessive in amount. The latter attack need not detain us long for it rests solely upon the fact that the award exceeds the maximum of $1,500 permitted when such awards are made pursuant to Government Code section 800. The short answer to this objection is that the award before us was not made pursuant to that statute and presumably could not have been. (See *Rutherford* v. *Board of Trustees,* 37 Cal.App.3d 775, 781-782 [112 Cal.Rptr. 560].)

We turn now to the question whether the challenged award of attorneys' fees was authorized. As previously noted, this litigation has always been, among other things, a taxpayers' equitable suit seeking in part declaratory relief against the Agency expending tax increment funds attributable to the original project within the area added thereto by the challenged amendments, and receiving tax increment funds from such added area. The trial court granted plaintiffs declaratory relief to this effect. This result substantially benefits the affected taxing agencies, named in the judgment (and through them their taxpayers), since it reduces both the occasion for the Agency's expenditure of such funds and the Agency's source of such funds as well. A taxpayers' suit is by its very nature a representative action. (See *Harman* v. *City and County of San Francisco,* 7 Cal.3d 150, 160 [101 Cal.Rptr. 880, 496 P.2d 1248].) Accordingly, we hold that the award of attorneys' fees made in this case to plaintiffs' counsel was authorized under the substantial benefit doctrine. (See *Mandel* v. *Hodges,* 54 Cal.App.3d 596, 621, 623 [127 Cal.Rptr. 244].)

## DISPOSITION

The judgment is affirmed. Respondents are awarded attorneys' fees on appeal in the amount of $2,000, to be paid from the same source as their attorneys' fees at trial.

Allport, J., and Potter, J., concurred.

A petition for a rehearing was denied September 21, 1976, and the judgment was modified to read as printed above on September 22, 1976. Appellant's petition for a hearing by the Supreme Court was denied December 9, 1976.