[Civ. No. 49520. Second Dist., Div. Two. June 22, 1977.]

BERTHA REGUS et al., Plaintiffs and Appellants, v.
CITY OF BALDWIN PARK et al., Defendants and Respondents.

COUNSEL

Telanoff, Bobrowsky, Wallin & Dilkes, Telanoff, Wallin, Kress & Dilkes, Peter L. Wallin and C. Edward Dilkes for Plaintiffs and Appellants.

Graham A. Ritchie and David McEwen for Defendants and Respondents.

## OPINION

FLEMING, J.—Defendant City of Baldwin Park (City) on 3 and 8 July 1975, adopted ordinances No. 709 and No. 708 approving a redevelopment plan for the Puente-Merced/South Baldwin Park Redevelopment Project (Project) submitted to it by the Baldwin Park Redevelopment Agency (Redevelopment Agency). On 29 August 1975 plaintiffs filed their complaint challenging the project, pleading both a validation action (Code Civ. Proc., § 863 and Health & Saf. Code, §§ 33500, 33501) and a taxpayer's action to enjoin illegal municipal expenditures (Code Civ. Proc., § 526a). Individual plaintiffs are residents and taxpayers of City who own real properties assessed for taxes within one year last past by the County of Los Angeles and by taxing agencies levying taxes upon property within Project boundaries. Plaintiff League to Preserve Constitutional and Civil Rights (League) is an unincorporated association composed of City residents. No individual plaintiff or member of League resides within or owns or pays taxes on property within Project boundaries.

The trial court concluded that none of plaintiffs had standing to prosecute the action, but it nevertheless reviewed the administrative record before the city council and found substantial evidence to support council findings that the Project area was a blighted area whose redevelopment was necessary to effectuate the purposes of the Community Redevelopment Law (Health & Saf. Code, § 33000 *ff.*; hereafter CRL).

Plaintiffs appeal the court's judgment validating the Project, contending, (1) they are interested persons within the meaning of Code of Civil Procedure section 863 and entitled to bring a validation action challenging the Project, (2) the Project is invalid because its area, rather than being blighted, is in the seminal stages of new development, whose fiscal benefits are being illegally diverted by defendants Redevelopment Agency and City under the guise of redevelopment.

I

■ Plaintiffs have standing to bring a validation action and a taxpayer's action to challenge the Project. In *Sweetwater Valley Civic Assn.* v. *City of National City* (1976) 18 Cal.3d 270 [133 Cal.Rptr. 859, 555 P.2d 1099], the California Supreme Court, without discussion of standing, entertained a civic association's attack on a redevelopment project

for an area consisting of a golf course and vacant land, where plaintiff ownership of property within the project area was not alleged and where ownership was unlikely because another entity owned 115 of 130 acres within the project. In upholding suit the court noted that section 33501 specifically authorizes judicial review of the validity of a redevelopment project by the procedure set out in Code of Civil Procedure sections 860 *ff.,* and that Code of Civil Procedure section 863 allows "any interested person" to bring such an action. Plaintiff in *Sweetwater* alleged that its members were taxpayers, residents, and property owners of Sweetwater Valley, an allegation comparable to that of plaintiffs at bench, who assert they are residents and taxpayers of the City in which the redevelopment project is located.

Standing to initiate a validation proceeding was likewise upheld in *Card* v. *Community Redevelopment Agency* (1976) 61 Cal.App.3d 570 [131 Cal.Rptr. 153], on the stipulation that plaintiffs were citizens, residents, and taxpayers of the city and " 'interested in the matter of the amendments to the redevelopment plans for the Monterey Hills Project No. 1.' " (P. 575, fn. 6.) The stipulation in *Card* did not declare that plaintiffs owned property within the project area. We think it unlikely the Legislature intended to limit review of such projects to actions initiated by the agency itself or by residents of the project area, given the presumptively disadvantaged and blighted condition of a redevelopment project area, which may be largely vacant or in a state of disrepair and disuse. As taxpayers of the City of Baldwin Park and of the County of Los Angeles, plaintiffs have a financial interest in the outcome of this proceeding, in that the tax increment financing of the Project will divert tax revenues from the taxing agencies to which plaintiffs pay taxes to the treasury of the Redevelopment Agency. Such a financial interest is likely to motivate plaintiffs to prosecute the action vigorously and provides sufficient basis to give them standing. (See *Harman* v. *City and County of San Francisco* (1972) 7 Cal.3d 150, at p. 159 [101 Cal.Rptr. 880, 496 P.2d 1248].) Moreover, a validation action under Code of Civil Procedure sections 860 et seq., and a taxpayer's action under Code of Civil Procedure section 526a are not mutually exclusive. (*Card* v. *Community Redevelopment Agency, supra,* at p. 576.) Both actions may be brought against a redevelopment project if suit is filed within the 60-day period prescribed for the validation action. (See *Plunkett* v. *City of Lakewood* (1975) 44 Cal.App.3d 344 [116 Cal.Rptr. 885].) We conclude that plaintiffs as resident taxpayers of City and county, who allege illegal diversion of municipal and county funds to finance the Project, have standing to maintain the action. (*Harman* v. *City and County of San*

*Francisco* (1972) 7 Cal.3d 150 [101 Cal.Rptr. 880, 496 P.2d 1248]; *Rathbun* v. *City of Salinas* (1973) 30 Cal.App.3d 199 [106 Cal.Rptr. 154]; *White* v. *Davis* (1975) 13 Cal.3d 757 [120 Cal.Rptr. 94, 533 P.2d 222].)

## II

The Project area is located in the southern part of City and consists of two separate noncontiguous sites along the San Bernardino Freeway.

The Puente-Merced site of 29 acres is located north of the freeway and consists of mixed residential and commercial properties. According to the redevelopment report and plan submitted to the city council, homes are single-family residences, with one multi-family residence. All housing is "older stock fairly well maintained with isolated examples of deteriorating construction." Fifty-one percent of total acreage is vacant. Most buildings in the area are one-story older structures, adequately maintained, and showing normal signs of aging. Land parcelization in the area is irregular and has resulted in poorly used parcels of irregular shape and depth with minimal frontage. Current zoning is piecemeal and suggests that the area is undergoing transition.

The South Baldwin Park site of 53 acres lies south of the freeway and consists of commercial and industrial development. One acre is vacant. According to the redevelopment report, on 25 acres of the site a United Parcel Service distribution facility is being constructed and a new Nichols Lumber facility has been recently completed. The remaining 27 acres are utilized primarily by vehicular-oriented commercial services. These include a drive-in movie, a camper sales lot, two auto repair facilities, and a truck-trailer sales and storage lot.

The redevelopment report's analysis of the condition of the buildings in the two portions shows that in 13 parcels at the Puente-Merced site, the following conditions prevail:

| | |
|---|---|
| Excellent | 1 |
| Older but well maintained | 3 |
| Fair | 3 |
| Old and Obsolete | 3 |
| Dilapidated | 2 |
| Not Surveyed | 1 |

The report states that by and large buildings at that site are of older construction, exhibit characteristics of age and deterioration, but are not unsafe or unfit for use.

At the South Baldwin Park site the condition of buildings is as follows:

| | |
|---|---|
| In Construction | 1 |
| Excellent | 0 |
| Older But Well Maintained | 3 |
| Fair | 4 |
| Old and Obsolete | 2 |
| Dilapidated | 0 |

Nearly half the site consists of newly finished construction or construction in progress.

The report notes that both sites have excellent freeway access, but that neither has developed in a way to take advantage of freeway-oriented uses. Both sites are characterized by underdeveloped land and by interim use facilities with minimal permanent construction. According to the report, a major constraint to redevelopment through private initiative has been the irregular parcelization that inhibits assembly of land for efficient development.

The redevelopment report proposes the development of freeway-oriented commercial uses in the Project area, including motels, hotels, business parks, and shopping centers, in order to generate revenue for the City and jobs for its residents. The City desires to facilitate construction of a K-Mart discount shopping center in the Project area in order to prevent loss of sales tax revenue to neighboring communities. For shopping-center purposes the Puente-Merced site possesses excellent access and would provide a suitable environment. Realization of this goal can best be accomplished by assemblage of the necessary acreage through redevelopment.

The two sites are noncontiguous and located more than a mile apart.

Based on the report and plan summarized above, the city council authorized the Project by adopting ordinance No. 709, which stated in the language of the applicable statutes that the Project area is a blighted area whose redevelopment is necessary to effectuate the purposes of the Community Redevelopment Law. Section 9 of the ordinance declares it

is an urgency ordinance *to take effect* immediately because the financing of redevelopment "is not within the current fiscal capabilities of the City's resources" and must be funded through "current new ad valorem tax resources, if such resources become applicable prior to the tax equalization of the County's Assessment Rolls." These new tax resources, the redevelopment report indicates, are the newly assessed valuations of the United Parcel Service and Nichols Lumber properties, anticipated to produce tax revenues of $126,640 annually. At the time of approval and adoption of the Project these newly assessed valuations had not yet reached the county assessment rolls. With validation of the Project the revenues resulting from these newly assessed valuations will be diverted from the treasuries of the regular taxing agencies to that of the Redevelopment Agency.

## III

■ We evaluate the administrative findings in accordance with the substantial evidence rule applicable to judicial review of a redevelopment project. (*In re Redevelopment Plan for Bunker Hill* (1964) 61 Cal.2d 21, at p. 39 [37 Cal.Rptr. 74, 389 P.2d 538]; *Sweetwater Valley Civic Assn. v. City of National City* (1976) 18 Cal.3d 270 [133 Cal.Rptr. 859, 555 P.2d 1099].) ■ The critical issue is whether the Project area is a blighted area.

Preliminarily, we note that the proposal at bench involves a type of redevelopment that has concerned the Legislature in recent years and prompted the passage of Assembly Bill No. 3672 (Stats. 1976, ch. 1336), amending the Community Redevelopment Law in several respects. Under the loosely-drawn provisions of the former statute the area within a redevelopment project might include noncontiguous, unblighted areas, added for the purpose of capturing their tax revenues and without other justification for their inclusion. (See Leg. Counsel's Dig. to Stats. 1976, ch. 1336, No. 7 Deering's Adv. Legis. Service, pp. 1063-1064.) Thus, the prior law (applicable here) simply states that "The area included within a project and a project area may be either contiguous or noncontiguous." (Former Health & Saf. Code, § 33320.2.) By contrast, new section 33320.2 (eff. 1 Jan. 1977) requires a stronger showing to justify the inclusion of noncontiguous, unblighted areas in a project. It declares: "An *unblighted, noncontiguous area shall be deemed not necessary* for effective redevelopment if such an area is included for the purpose of obtaining the allocation of taxes from such area pursuant to Section 33670 without other substantial justification for its inclusion." (Italics added.) New section 33321 declares, "[e]*ach such area included*

*under this section shall be necessary for effective redevelopment* and shall not be included for the purpose of obtaining the allocation of tax increment revenue from such area pursuant to Section 33670 without other substantial justification for its inclusion." (Italics added.) This legislative history and policy are of particular importance here, because the gist of plaintiffs' attack on the Project is that the noncontiguous South Baldwin Park area is not blighted, and contains valuable new construction by United Parcel Service and Nichols Lumber, which was underway before redevelopment was approved. Plaintiffs suggest the avowed purpose of City is to include the South Baldwin Park area in the Project in order to capture tax revenues for the Redevelopment Agency from construction in progress.

This argument is solidly based, for both the administrative transcript of the public hearings before the council and the facts presented in the redevelopment report clearly demonstrate that the key motivation for the Project in its present form is to capture $126,640 in tax revenues from new construction in the South Baldwin Park site in order to carry and make profitable development in both sites of the Project area.[1] The land in both sites is assessed at a low valuation and perhaps could be put to more productive uses, but no substantial evidence suggests the existence of blight at either site, except that parcelization in the Puente-Merced area is irregular and private development appropriate to its freeway location has not yet occurred. There is little evidence of deteriorating structures (none in the South Baldwin Park site), and no evidence of physical dangers or health hazards to the inhabitants of either site.

---

[1]Quotations of the relevant evidence are as follows:

Excerpt from the public hearing: "JAMES MAGNER—I was retained by the Agency to study financial feasibility of the project as proposed by the planning report prepared by William L. Pereira and Associates. I analyzed the potential of the project from two (2) concepts. That is, by keeping the two areas, Puente-Merced and South Baldwin Park, separate, to try and make some determination as to the feasibility of each area being able to support itself separately, and by combining the two. My analysis reflected that the cost that would be apparent to each of the sites separately would be of such proportions, as not supportable by the types of revenues that would be generated by the projects separately. Therefore, if they were to be a success, would require additional frontage from the City itself. *However, by combining the two projects and capturing the existing increment the potential of financing the project on a combined basis seems quite feasible.*"

area to be studied for redevelopment possibilities centered around the intersection of Puente and Merced Avenues, where land uses are predominantly commercial or vacant land. The survey area was amended by the City Council on March 19, 1975, when preliminary studies by the Agency's Economic Consultant, Economic Research Associates, indicated that redevelopable property in the Puente-Merced would not be sufficient to support short-term market potentials without considering the redevelopment of further residential properties, and when the Agency's Fiscal Consultant indicated that a solid financial basis for tax increment bonding would not exist for a project scaled to

The issue is whether the foregoing facts constitute substantial evidence to support legislative findings of blight, of the need for redevelopment, and the need for inclusion of the South Baldwin Park site in the Project. With respect to the statutes in effect at the time of adoption of ordinance 709 (Health & Saf. Code, § 33000 et seq.) the court in *Sweetwater Valley Civic Assn.* v. *City of National City* (1976) 18 Cal.3d 270 [133 Cal.Rptr. 859, 555 P.2d 1099], summarized the requirement of blight as follows:

"To allow redevelopment under CRL, the proposed area must be blighted. A finding of blight requires (1) that the area suffer 'either social or economic liabilities, or both, requiring redevelopment in the interest of the health, safety, and general welfare' and (2) the existence of one of the characteristics of blight. (§ 33030 (fn. 3).)

"In addition, section 33030 and the sections set forth above clearly establish that it is not sufficient to merely show that the area is not being

that site. The amended survey area includes commercial and industrial land south of the San Bernardino Freeway near South Baldwin Park Boulevard which can support the market demand and also *provide financial support to the project from on-going development in that area.*"

Excerpt from the report to the council:

"The increment generated by the above development [Puente-Merced site] should accommodate a tax allocation bond issue of approximately $2,000,000 which by itself is not sufficient to meet the cash requirements of a Puente-Merced Redevelopment Project.

". . . . . . . . . . . . . . . .

"The increment generated by the above development [South Baldwin Park site] should accommodate a tax allocation bond issue of approximately $1,500,000, which by itself is *not* sufficient to meet the cost requirements of a South Baldwin Park Redevelopment Project.

". . . . . . . . . . . . . . . .

"It is known, at this point in time, that certain development interests exist and that appropriate disposition agreements could be executed if a plan was adopted and a project funded. These development interests include a Discount Department Store complex and Quality Motor Inn and Budget Motel.

"The increment as shown on Schedules III and VI total $298,166.—The balance of the available increment in the South Baldwin Park site is $126,640, represented by United Parcel Service and Nichols Lumber Company development, bringing the total increment available to $424,806.

". . . . . . . . . . . . . . . .

"In this instance, *the inclusion of United Parcel Service and Nichols Lumber Company properties* not only *are required to make the plans financially feasible,* in that they represent 30% of the 'increment collateral,' but they will also contribute materially to the lower cost of borrowing as well as reducing the requirements for funded interest and reserves.

". . . . . . . . . . . . . . . .

"It can, therefore, be concluded that financial feasibility of the Puente Site is dependent upon the inclusion of the South Baldwin Park Site. The two sites, in fact, are mutually dependent upon each other. Together the two sites offer the City of Baldwin Park an opportunity to commence sound development that is financially feasible." (Italics added.)

put to its optimum use, or that the land is more valuable for other uses." (*Sweetwater,* at p. 277.)

The *Sweetwater* opinion noted that the necessary characteristics of blight may include (1) economic dislocation, deterioration, or disuse resulting from faulty planning; (2) a growing or total lack of proper utilization of areas, resulting in a stagnant and unproductive condition of land potentially useful and valuable for contributing to the public health, safety, and welfare; (3) a loss of population and reduction· of proper utilization of the area; (4) a prevalence of depreciated values, impaired investments, and social and economic maladjustment to such an extent that the capacity to pay taxes is reduced and tax receipts are inadequate for the cost of public services rendered. (Pp. 274-275, fns. 3, 4.) Blighted areas are characterized by one or more of these conditions, which may justify redevelopment, provided the area suffers "either social or economic liabilities, or both, requiring redevelopment in the interest of the health, safety, and general welfare." (Former § 33030; *Sweetwater Valley Civic Assn.* v. *City of National City, supra,* at p. 277.)

In *Sweetwater* the court found insufficient justification for redevelopment in a showing that an area is "not being put to its optimum use, or that the land is more valuable for other uses." (18 Cal.3d at p. 277.) The court quoted with approval from *Redevelopment Agency* v. *Hayes* (1954) 122 Cal.App.2d 777, 793, 812 [266 P.2d 105]; " 'Public agencies and courts both should be chary of the use of the act unless, as here, there is a situation where the blight is such that it constitutes a real hindrance to the development of the city and cannot be eliminated or improved without public assistance. It never can be used just because the public agency considers that it can make a better use or planning of an area than its present use or plan.' " (P. 278.)

The true blight that authorizes the use of the power of statutory redevelopment may be seen in the description of conditions at Bunker Hill prior to redevelopment: "A health department survey of December 1955 disclosed the following percentages in living conditions: extremely substandard 39.62 per cent, substandard 22.22 per cent, poor 19.92 per cent, and acceptable 18.24 per cent. A building and safety department survey of April 1957 discloses the following percentages in building conditions: dangerous (239 out of 395) 60 per cent, substandard 16 per cent, and standard 24 per cent. The area crime rate was testified to be double the city average and the arrest rate within the project area more than eight times the city average. There was testimony that the fire rate per acre was nearly nine times the city average and that the per acre cost

of fire control for inspection was nearly eight times the city average." (*In re Redevelopment Plan for Bunker Hill* (1964) at p. 45.)

At bench, the evidence shows that the principal objectives of the Project, and the basis on which it was promoted, are to develop Project land profitably, to bring more private enterprise (such as K-Mart) to Baldwin Park, to raise land values, and to promote commercial and industrial development. Significantly, the redevelopment report to the City advanced as reasons for the Project:

(1) improper utilization of area;

(2) irregular parcelization;

(3) low tax revenues;

(4) difficulty in assembling land;

(5) difficulty in promoting desirable development.

The existence of blight as a reason for the selection of the Project area was not mentioned. ■ All testimony of City residents in support of the project invoked the hope of commercial and industrial development, a concededly desirable goal in a community characterized as depressed (*Serrano v. Priest* (1971) 5 Cal.3d 584 [96 Cal.Rptr. 601, 487 P.2d 1241]), but one insufficient by itself to justify use of the extraordinary powers of community redevelopment. If it were, tax increment financing at public expense would become commonplace as a subsidy to private enterprise. The subsidies contemplated here are substantial. According to the financial feasibility report prepared by the Redevelopment Agency, the projected subsidy to private development could conceivably approximate $5,000,000 out of total agency revenues of $6,078,000.[2]

---

[2]Financial feasibility report, exhibit III in report to city council:

| | |
|---|---:|
| Bond Issue (based on available increment from an immediate cash flow ($126,640) and disposition and development agreements ($298,166) | $5,000,000 |
| Land Sale Proceeds (based on William L. Pereira Associates land use study) | 1,085,950 |
| Total Revenues | $6,085,950 |
| *Estimated Project Costs* | |
| Schedule I | $2,790,119 |
| Schedule IV | 2,488,150 |
| | $5,278,269 |
| Estimated costs of bond issue, funded interest and cash reserve | $ 800,000 |
| Total Costs | $6,078,269 |

■ It is clear that the expectation of economic improvement and the prospect of speculative gain by themselves furnish an insufficient basis for use of the powers of redevelopment under CRL. Prerequisite to use of the act is a showing of the existence of blight; and blight in the context of this case can only be found in the "inability of private enterprise to redevelop the area." (*Sweetwater, supra,* at p. 278, fn. 6; §§ 33071, 33037.) On this record this inability can only be premised on irregular parcelization of land, which under CRL is one of the characteristics of blight,[3] and on the absence of substantial commercial development thus far in the Puente-Merced site.[4] Certainly there is no evidence to show that the Project area is either a social or an economic liability—except in the sense that it might be made more profitable to the City than it now is. Further, there is evidence that the South Baldwin Park site is in the process of private development and that land assembly is not only possible but an accomplished fact, viz. the United Parcel Service and Nichols Lumber development of 25 acres. Even if we assume that the legislative determination of blight in respect to the Puente-Merced site is sufficiently supported by evidence of irregular parcelization and the nonexistence of substantial private development, coupled with slight evidence of deteriorated housing, no evidence whatever suggests that the noncontiguous South Baldwin Park site is blighted, given its 25 acres of new construction and the absence of dilapidated and deteriorated housing therein. As the court said of the proposed redevelopment area in *Sweetwater*: "The real property to this action has not become an economic liability within the purview of section 33030; nor is there evidence of 'social' blight. Drainage and soil problems—and even condemnation of part of the golf course—while no doubt burdening the property, have not ended its present economic use. To the contrary, the evidence reveals the golf course is at least marginally profitable. While the costs of removing the easements and solving the drainage problems make private redevelopment infeasible, that issue arises only after first finding the subject property is blighted. In the circumstances, the golf course being economically profitable—in combination with its open space nature—the property constitutes neither an economic nor a social liability. Therefore, it is not blighted." (At p. 279.)

[3] "A blighted area is characterized by: (b) The subdividing and sale of lots of irregular form and shape and inadequate size for proper usefulness and development." (Health & Saf. Code, § 33032, subd. (b).)

[4] There was testimony at the hearing that "there isn't one of us in the Merced-Puente area that couldn't develop our own property and have some use for it." Further, the testimony of the owner of a Denny's Restaurant and surrounding four acres was to the effect that he had difficulty developing the property and finding tenants because of City's refusal to issue necessary permits, *not,* as respondent alleges, because of irregular parcelization.

It is true that prior to the 1976 amendments unblighted areas could be included in a project. But even prior to 1976 the question of blight was required to be determined by evaluation of the project area as a whole. Individual characteristics of blight set out in the legislation merely operated as indicia of the presence or absence of blight in the area as a whole for conditions of blight must "*predominate*" and must "*injuriously affect the entire area*" (Health & Saf. Code, § 33321, italics added). Consequently, while a project area was not required to consist of contiguous parcels or be blighted in all its portions, it was required to be blighted when considered as a whole. At bench evidence of blight at the Puente-Merced site largely rests on irregular parcelization, and there is no evidence of blight at the South Baldwin Park site. Even under the former provisions of section 33321, the Project cannot stand unless there is a showing that the Puente-Merced conditions "predominate and injuriously affect the entire area." We find nothing in the record to show that conditions at Puente-Merced have the slightest effect on conditions at South Baldwin Park, located a mile away on the opposite side of the freeway. There is no showing that intensive development in one will create significant traffic or other environmental problems in the other which could only be controlled by including both sites in the project. And to include both sites merely to provide enough money for the entire project is clearly impermissible, both under present law and under former law. The staff report of the Senate Local Government Committee that recently investigated redevelopment pointed out the fiscal abuses that can result from the inclusion of profitable new construction or potentially valuable unblighted land in a redevelopment survey.

"b. Non-redevelopment caused activity. Under existing law, a project area can be designated which contains much private activity totally unrelated to redevelopment. . . . Yet the tremendous increased assessments will accrue to the redevelopment agency, and the taxing jurisdictions will not even be able to capture a cost of living increase on the property. *It is technically possible under existing redevelopment law for an agency to go through the files of the city building department and pull out all building permits granted on which construction has not begun and put the subject property into a redevelopment project area in order* to get the tax increment." (Staff Rep. on Tax Increment Financing of Redevelopment, Dec. 5, 1975, pp. 6-7; italics added.)

IV

· Some general discussion of the reasons for the legislative restrictions attached to the use of the Community Redevelopment Law is appropriate.

Under the law, blight must be found before redevelopment can be authorized, because, first, without evidence of blight there is no solid justification for compelling taxpayers in one section of the community, for example those in the county, the school district, and in Baldwin Park outside the Project area, to subsidize the cost of development of another section of the community by carrying a disproportionate share of the cost of local government.[5] Second, unrestricted use of redevelopment powers fosters speculative competition between municipalities in their attempts to attract private enterprise, speculation which they can finance in part with other people's money. When the extraordinary powers of legislation designed to combat blight and renew decayed urban areas are used as a fiscal device to promote industrial, commercial, and business development in a project area that is merely underdeveloped rather than blighted, competitive speculation may be turned loose. By misemploying the extraordinary powers of urban renewal a redevelopment agency captures pending tax revenues which it can then use as a grubstake to subsidize commercial development within the project area in the hope of striking it rich. Such schemes contemplate borrowing money by issuing bonds on the strength of assured future tax revenues, money which is then used to acquire, improve, and resell property within the project area at a loss as an inducement to business enterprises such as K-Mart to locate within the project area rather than in neighboring communities. In essence, tax revenues are used as subsidies to attract new business. The immediate gainers are the subsidized businesses. The immediate losers are the taxpayers and government entities outside the project area, who are required to pay the normal running expenses of government operation without the assistance of new tax revenues from the project area.

The promoters of such projects promise that in time everyone will benefit, taxpayers, government entities, other property owners, bondholders; all will profit from increased development of property and increased future assessments on the tax rolls, for with the baking of a bigger pie bigger shares will come to all. But the landscape is littered with speculative real estate developments whose profits turned into pie in the sky; particularly where a number of communities have competed with one another to attract the same regional businesses. Undoubtedly, it was for these reasons that the Legislature restricted urban renewal to

---

[5]Bloom, *Fiscal Productivity and the Pure Theory of Urban Renewal* (May 1962) 38 Land Economics, 135, 142 Schaaf, *Public Policies in Urban Renewal: An Economic Analysis of Justifications and Effects* (Feb. 1964) 40 Land Economics 67, 70, 77; Staff Report on Tax Increment Financing of Redevelopment, California Senate Local Government Committee (1975) pages 12, 17, 31, 57.

blighted areas, and, when faced with abuses in 1976, further tightened its restrictions.

At bench, City's projected redevelopment plan possesses a particularly speculative cast in that the businesses it hopes to attract through redevelopment are primarily those of consumption rather than production, businesses such as hotels and shopping centers whose acquisition does not increase the total wealth of a region as a whole but merely redistributes the existing supply by capturing business from rival communities. The success of such strategy assumes the absence of effective counter-measures by rival communities targeted for displacement. Private enterprises may embark on such speculative competitive enterprises. Under present laws, public entities may not.

We conclude that the record at bench contains no substantial evidence to show that Project area is a blighted area and hence eligible for redevelopment. We believe the county correctly characterized this Project as development rather than redevelopment.

The judgment is reversed, and the trial court is directed to enter judgment for plaintiffs in accordance with this opinion.

Roth, P. J., and Compton, J., concurred.

A petition for a rehearing was denied July 19, 1977, and the opinion was modified to read as printed above. Respondents' petition for a hearing by the Supreme Court was denied September 8, 1977.