[Civ. No. 7801.   Second Appellate District, Division Two.—September 28, 1933.]

CITY OF SOUTH PASADENA (a Municipal Corporation), Appellant, v. CITY OF SAN GABRIEL (a Municipal Corporation) et al., Respondents.

404

Walter F. Haas, Horace E. Vedder, Harold G. Johnston and Gerald E. Kerrin for Appellant.

H. S. Farrell, City Attorney, Hill, Morgan & Bledsoe, Vincent Morgan and Kenneth K. Wright for Respondents.

WORKS, P. J.—South Pasadena and San Gabriel are both cities of the sixth class. While their respective corporate limits are not contiguous, the two municipalities lie near each other. South Pasadena operates a municipally owned water system by means of which it furnishes water for domestic and other uses to property lying in a certain part of its domain, and as the sources of this water supply had become insufficient to discharge the duty imposed upon them, the city bought a tract or lot of land in San Gabriel, with the purpose of drilling a well upon it, conveying the water developed therefrom into the territory of South Pasadena, thus augmenting the water supply of that portion of the municipality served by it. The parcel of land thus acquired in San Gabriel overlies the water plane of San Gabriel

Valley, within which latter both cities are situated. For the purposes of this opinion the lot is sufficiently identified by reference to it as lot A. The property was acquired by South Pasadena in June, 1929.

On March 25, 1930, South Pasadena filed with the city clerk of San Gabriel a communication addressed to the city council of the latter municipality. So far as it is material to the present controversy the paper reads as follows: ''The City of South Pasadena, the owner of Lot A, . . . together with the water rights appurtenant thereto, hereby makes application for a permit to drill a water well on said land, construct an underground pump-house and connecting pipeline in Rose's road. In filing this application we do so without prejudice to our rights.'' The city council of San Gabriel, on April 8, 1930, denied the application thus made.

At all the times which are of interest here there was in effect in San Gabriel an enactment known as ordinance 197, which had been passed by the city council of the municipality. The ordinance, to quote from appellant's brief, ''makes it unlawful for any person to drill for water, oil or any substance within the corporate limits of said city, without first having obtained a permit so to do from the city clerk''. In view of this language it is to be remembered that South Pasadena made its application for a permit to the city council of San Gabriel, and not to the city clerk. Moreover, the cause was tried upon the theory that ordinance 197 required a permit to drill for water to be obtained from the council. There is not, therefore, any real question in the case as to whether the council, in adopting the ordinance, delegated any illegal or unconstitutional authority to the clerk, or attempted to confer any such authority upon him. In this connection see *Gaylord* v. *Pasadena,* 175 Cal. 433 [166 Pac. 348]. It is also to be observed, upon this particular phase of the case, that respondents' brief contains the following: ''It is to be noted that in the instant case the application for the permit was presented to the city council and acted upon by it, and consequently the question of whether or not the ordinance unlawfully delegates to the city clerk powers of the city council is not of great moment inasmuch as the city council actually acted.'' This statement is not challenged or noticed in appellant's reply brief.

The action, so called above, is really a proceeding for the writ of mandate, commenced for the purpose of compelling the allowance of the refused permit. In view of what is said above it is particularly to be observed that the petition or complaint in the proceeding prays that the city council of San Gabriel, not the city clerk, be required to issue it. Judgment went for defendants and plaintiff appeals.

It is contended by South Pasadena that ordinance 197 is invalid because it confers arbitrary and uncontrolled powers over the disposition of petitions for permits to drill for water. It is said that where a business is lawful, and permits for its inauguration are required, an ordinance providing the requirement must contain rules and regulations to be followed by the officer or officers who consider applications for permits. This is indeed the rule as to a business which cannot work harm to the morals, health or general welfare of the city in which it is to be inaugurated, or to citizens in its proposed neighborhood. But the rule is different where the business, although perfectly lawful in character, may work such harm in its conduct. In such instances the granting or refusing of a permit to operate the business may be confided to the reasonable and proper discretion of an officer or officers, without the imposition of rules to regulate or guide their actions (*Gaylord* v. *Pasadena, supra; In re Holmes*, 187 Cal. 640 [203 Pac. 398]; *Parker* v. *Colburn*, 196 Cal. 169 [236 Pac. 921]). We think we may take judicial notice that the drilling for water and the consequent use of the water thereby developed, together with the employment and maintenance of such agencies as may naturally conduce to such use, might under certain circumstances and in certain portions of the territory of San Gabriel, or of any other city, be detrimental to the health, comfort or welfare of its inhabitants. These conclusions bring us to the next question to be discussed.

South Pasadena insists with vigor that the improvement designed by it for installation on lot A would not have been accompanied, either in its installation or in the operation of the well proposed to be sunk, together with the necessary adjuncts of operation, by circumstances detrimental to the rights of any of the people of San Gabriel. South Pasadena therefore contends that the refusal of the city council to

grant the requested permit was unjust, arbitrary and an improper exercise of discretion, and that the issuance of the permit should therefore be compelled. In other words and in effect, South Pasadena contends that it should have its permit for the reason upon which, alone, the judgment in *Gaylord* v. *Pasadena, supra,* was affirmed, as shown at the conclusion of the opinion in that case.

Various questions touching this point were developed by the evidence before the trial court, and one of these may be disposed of at once. It is admitted by South Pasadena that "there is a substantial conflict of evidence in the record that such an undertaking [as that contemplated by the request for the permit] may affect property values to some extent". This statement refers to property values in the portion of San Gabriel proposed to be occupied by the contemplated water-well and its appurtenances. Leaving this particular point, we go to other matters which will require a somewhat lengthy and particular statement.

The portion of San Gabriel within which the contemplated improvement was proposed to have been installed is considered by that city to be a residence district. It is regarded by South Pasadena as a rural or semi-rural community. This portion of San Gabriel, and more particularly a section referred to in testimony before the trial court immediately to be mentioned, will hereafter be designated, for the sake of brevity, as the district. The trial court found that the district was being used and developed solely and rapidly as a residence district. The evidence showed that there were forty-seven family residences within a radius of 1,000 feet from lot A, and also that the property therein was not cut into lots of the usual city size but much larger. Lot A itself is 3.5 acres in extent. South Pasadena sets forth in its brief some interesting figures concerning the circle referred to in the evidence, although it is erroneously described in the brief as a "1,000 foot circle". The figures given by South Pasadena show, however, that its council contemplated a circle with a diameter of 2,000 feet, a 2,000-foot circle, and not a 1,000-foot one. We quote from the brief: "This does not show a highly developed, thickly populated district. In determining the density of population in this area, we should not lose sight of the fact that the land within a 1000-foot circle covers an area of ap-

proximately 75 acres; that each city block contains 3 acres of land, that a 1000-foot circle contains 15 [25] city blocks; that 47 residences in 15 [25] blocks averages a little over 3 [a little less than 2] residences per block. As the official average family is composed of four members, we have an average of 190 persons occupying the 47 residences on the 75 acres within the circle; this gives us an average of 2.50 persons per acre. We shall next consider the density of population per acre of the county and surrounding cities. In Los Angeles county south of the mountains the official records give the density of population as 2.70 persons per acre. The city of Alhambra has a density of 7.32 persons per acre, while the city of South Pasadena has a density of 6.84 persons per acre. Pasadena shows a density of 6.57 persons per acre. . . . On the question of the rapid development in the neighborhood, we direct attention to the fact that but 20 buildings were constructed within the district during the three years immediately preceding the commencement of this action. This is an average of less than seven buildings a year . . . ''

Upon these figures South Pasadena bases several arguments. Thus: ''We therefore contend that the land in question is exactly what we say it is, semi-rural, horticultural and agricultural, and further that its acres are not even as thickly populated as the average farm land in Los Angeles county and used for like or similar purposes.'' These views require some comment. The district is not semi-rural, for the reason that in a legal sense there is no such word. A search of five different dictionaries fails to locate it, although the expression is undoubtedly sometimes used in speech and writing, which are not always characterized by the nicety necessary to exact language. Rural, to take the definition of one lexicographer, means ''of or pertaining to the country, as distinguished from a city or town'', and the word is derived from the Latin rus, ruris, the country. The word urban is defined as ''of or belonging to a city or town'', and is derived from the Latin urbanis, which in that language imports the same meaning. This Latin word is derived, in turn, from urbs, urbis, a city. It is perfectly apparent that all territory is either rural or urban, and that, etymologically, there not only is not, but there cannot be, any such word as semi-rural. That is

the reason, plainly, why the expression is not to be found in even the unabridged dictionaries. It may be true that the district in question here is partially subjected to horticultural and agricultural pursuits in the same manner as are some parts of rural territory, but it is nevertheless urban and not semi-rural. That is settled by the fact that it lies within the territorial limits of San Gabriel. As a part of the city, and considering its condition at the time the evidence was taken in the trial court, as well as its adaptability for further settlement and improvement as a residence district, it is entitled, together with the remainder of San Gabriel, to be protected from the invasion of business establishments which, however lawful, are yet susceptible of a manner of operation injurious to the health, comfort or general welfare of its inhabitants. It must be freely admitted, of course, that harm from such a source is less likely to be wrought upon the people of the district than upon the inhabitants of a closely settled residential urban area, with houses built upon city lots of the usual size.

South Pasadena also contends that the evidence that twenty buildings were constructed within the district during three years—this being an average of 6.66 buildings each year —"does not show rapid development or unusual activity in the way of development". We think the contrary, when the true nature of the district is considered. We have already observed that the territory has not been cut into city lots of the customary size. The lots are much larger, although we are pointed to no place in the record—and it is most voluminous—which shows their average size, nor whether they are of equal size, or the sizes of the smallest and of the largest lots, if they are not alike in extent. Lot A itself comprises 3.5 acres. We have seen that the district includes some seventy-five acres. With this fact in mind, let us present some figures for the consideration of the curious, taking instead of the 6.66 residences, seven, as an aid to comfortable computation. On this basis, if we consider the acreage of lot A as representing the size of lots generally, 24.5 acres of the district have been occupied each year, which would mean that practically the entire area had been settled within the three years. This is a palpable absurdity, but we nevertheless begin with it. It is certain from this test that the lots in the district average less than

3.5 acres in extent. It we suppose two acres to be the average, 14 acres have been put under the hand of man each year. Even this, however, is a *reductio ad absurdum*, as we shall show by another method of approach. If we divide the number of acres in the district, seventy-five, by the number of houses standing upon its territory, forty-seven, we find one home to each 1.59 acres. Granting that the average size of the lots is less than this figure, which is doubtless the truth, granting that there is a *quantum* of unoccupied territory in the district, which naturally follows, granting further that the houses are somewhat unequally scattered over the area, it remains that the presence of a residence on each 1.59 acres, on an average, makes no mean showing that the property is a fairly well-developed residence district. This is true, especially, because the district is laid out in lots larger than the usual city lot, one of which, at least, is 3.5 acres in extent. The growth of the district, within the three years preceding the commencement of this proceeding, taken together with the conditions as to the size of the lots contained in it, demonstrates that the city council of San Gabriel, when it refused the permit asked by South Pasadena, was justified in finding that the district was adaptable for future settlement and improvement as a residence area.

After this preface, and proceeding upon it as a foundation, we come to a consideration of the question whether the improvement designed by South Pasadena for lot A is likely to be conducted and operated in such a manner as to be injurious to the health, comfort or general welfare of the inhabitants of the district.

The trial court made the following finding: "That the plaintiff proposed to construct on said lot A . . . a well 26 inches in diameter, with a computed production of 300 inches of water, constant flow (by inch is meant the 1/50th part of a cubic foot per second) ; an underground pump-house or chamber having its roof or ceiling 18 inches below the surface of the ground, said building to be insulated with sound-proofing material, said chamber to have installed therein two electric motors, one of 250 horsepower to pump water from said well into an underground reservoir to be constructed in the proximity of said well, and one of 350 horsepower to pump said water from said reservoir into the

transmission line and thence into the distributing system of the said City of South Pasadena; also a removable derrick to be erected and kept in place only when pulling pipe or making repairs, the power transmission lines to be brought into said pump-house through underground insulated conduits with a transformer to be placed either on the pole line or in said underground chamber, as the circumstances might show to be safest and most desirable. All of said machinery to be of the most modern and approved type. That the plaintiff consented in the event the writ herein sought should be granted, the court, as a part of its judgment, might prescribe all reasonable requirements or conditions as might make the plant and its operation so proposed to be erected on said property as free from deleterious noises, odors, danger and unsightliness as practicable." There is no contention that the finding is unsupported by the evidence.

Upon the face of this finding appear circumstances which, some possibly and some inevitably, will do harm not only to the health, comfort or welfare of the inhabitants of the district, but even to the people of San Gabriel as a whole. Three hundred inches of water, constant flow, is an immense quantity of the fluid. A 250-horsepower electric motor was to have been employed for the purpose of pumping the water from the twenty-six inch well. A 350-horsepower motor was to have been used to transport the water from the proposed reservoir into the contemplated transmission line. These facts alone show that within San Gabriel the construction, maintenance and operation of a considerable adjunct to the municipal water system of a foreign city were proposed. Particular injuries to the residents of the district and of San Gabriel generally from such maintenance and operation are pointed out in the finding or may be deduced from it. The water from the well was to have been carried through the transmission line into the distributing system of South Pasadena. It is apparent from a map in the record that this pipe-line must have been constructed for some distance across the territory of San Gabriel, either by means of a private right of way or under, along or across the city streets. If the line were to have been laid along a private way, the strip must have been subject to patrol and to the necessity, more or

less frequent, of excavation and to the consequent activity and disturbance incident to repairs or replacements, all to the inconvenience and discomfort of abutting property owners. If the pipe-line were intended to occupy the streets, the possible consequences to the general public of San Gabriel would have been even more serious. The effect of the installation, maintenance, repair and replacement of pipe-lines laid beneath city streets, from the standpoint of the comfort and convenience of users of the surface, is too well known to require specific description here. In truth, when South Pasadena asked the city council of San Gabriel for ''a permit to drill a water well on said land, construct an underground pump-house and connecting pipe line to its present line in Rose's Road'', South Pasadena was either asking for a franchise to lay a pipe-line in the streets of San Gabriel or was asking leave by some other means to transport a considerable water supply for its inhabitants across a part of the territory of San Gabriel, to the inevitable discomfort and inconvenience of property owners of the latter municipality. Indeed, the request for the permit amounted to an attempt, however innocently committed or with whatever benevolent intent toward the people of South Pasadena, to levy a contribution upon the inhabitants of San Gabriel to the end that South Pasadena, through the sacrifices of San Gabriel, might minister to the needs of a part of South Pasadena's inhabitants. San Gabriel owed no such self-immolation at the altar of a municipality foreign to itself.

Pursuing the text of the finding of the trial court further, it is to be noted that the improvements on lot A contemplated ''a removable derrick to be erected and kept in place only when pulling pipe or making repairs''. It is evident to us that this portion of the finding is pregnant with meaning when we seek a justification of the action of the city council of San Gabriel in refusing the requested permit. A removable derrick of the size apparently necessary to the performance of the functions expected of it under the plans of South Pasadena would surely occasion disturbance, and consequent discomfort to the denizens of the district, in its peregrinations to and from its necessarily varying places of duty in lot A. And with such a ''plant'' as the one proposed by South Pasadena for installation on the lot, the

occasions for "pulling pipe" or "making repairs" would doubtless have been of sufficient frequency to work discomfort, by the actual use of the derrick, to the community immediately surrounding lot A.

It is to be observed that the finding recites, "the power transmission lines to be brought into said pump-house through underground insulated conduits with a transformer to be placed either on the pole line or in said underground chamber, as the circumstances might show to be safest and most desirable". This reference to a pole line showed the possibility of injury to the comfort and general welfare of the people of the district. It has been a prominent point in local governmental conduct for many years to exclude "pole lines" from urban areas to as great an extent as possible. The objection to these unsightly erections is not merely esthetic—and an objection of that nature is not wholly unworthy of consideration—but practical as well, for their presence in a residence neighborhood will undoubtedly to some extent affect realty values in it. Further, the city council of San Gabriel could not have perceived, with equanimity, the possible necessity of burdening the city streets with poles, nor of subjecting a part of the people to the inconvenience subject to the maintenance, patrol and repair of a line of poles along a private right of way abutting upon their property, all this for the benefit of a foreign municipality. Nor could the council have seen with complacency the stringing, maintenance and repair of extra wires upon pole lines already in existence, if that is what the plan of South Pasadena contemplated—for the finding is not informative upon this question.

The finding is partially to the effect that "the plaintiff consented in the event the writ herein sought should be granted, the court, as a part of its judgment, might prescribe all reasonable requirements or conditions as might make the plant and its operation so proposed to be erected on said property as free from deleterious noises, odors, danger and unsightliness as practicable". This consent was negatively pregnant with the idea that the complete elimination of "deleterious noises, odors, danger and unsightliness" from the plant and from its operation would not have been practicable. This circumstance to some extent justified, after

the event, the refusal to grant the permit requested by South Pasadena.

So much for the finding of the trial court which we have traversed. There is evidence in the record which serves to fill out and amplify the picture presented by the finding. There was testimony from an hydraulic engineer that the use of the derrick referred to in the finding would be necessary to "raise the sand" pumped from the well. Then: "Q. . . . Have you any idea in that territory how often that would be required? A. No; that is another thing that absolutely would be—the amount of sand that the well pumps, it might be once a month or it might be twice a month or it might be once in three months, but it would all depend; probably about once a month they would have to clean out during the first year. Q. And they would have to dispose of the sand in some fashion? A. Yes. Q. Either in dumps upon the property or cart it away? A. Yes." The following testimony was given by the same witness: "Q. With reference to the operation of the well, would you anticipate in your opinion that it would be necessary to clean the well or pull it during the first year of operation? A. Well, from the general practice on wells in that vicinity, I would say yes. Q. If so, more than once, or how many times? A. Sometimes it require twice and sometimes three times during the year, a new well has to be pulled—a new pump has to be pulled and the well sand pumped, or certain conditions arise for pulling the pump. Q. If that were necessary how much time would be required during each period it would be necessary to have a derrick there? A. 30 days. Q. 30 days on each occasion? A. On each occasion, yes. Q. In your opinion after the first year would it be necessary to pull the well or clean it? A. Well, that is problematical entirely. Q. Well, just your opinion from experience. A. Well, it all depends on what formation they get for their water-bearing material. You might go into very coarse gravel with very fine sand and in that case clean the well out, of course, the second time or third time. Or the second time during the year might mean the well might be operated without being touched two or three years; it all depends entirely on the condition of the formation that you go through. Q. Are you familiar with the formation in that general territory? A. Yes; I am more or less

familiar with that territory. Q. Well, from your familiarity and your knowledge of conditions there, what would you expect with relation to the necessity for pulling the well following the first year? A. Well, I will just compare it to two—one well, we will say, the Alhambra well, called the Longdon well, from which the pump has been pulled, as I remember, twice now to sand pump the well. And on the Graves well we discharged sand and gravel there for thirty—practically thirty days before the water started to clear up. One spell when we pulled the pump out there probably was about 75 to 80 feet of sand in the well, and it was sand pumped again. That was the Graves well; that was about sixty days after the installation of the pump. Q. I mean following the first year now. A. As I said, that is problematical entirely, depending altogether—it might have to be pulled out every year and in four years it might go two or three years without having to be pulled; it all depends on conditions. Q. In pulling a well what is necessary; is it necessary a derrick be constructed? A. A derrick has to be either constructed, or if it is not constructed there has to be one that is constructed, a portable derrick, put over the pump and the pump raised by means of the derrick out of the well.'' There was also testimony to the effect that the power to be brought by wire into lot A for the purpose of operating the two proposed electric motors would have been of a comparatively high voltage, with the danger usually attendant upon such a state of affairs. Under a custom observed by companies which furnish electric power, the wire would have carried from 2,300 to 2,400 volts, the transformer mentioned in the finding then to reduce it to 440 volts.

■ South Pasadena attempts to make much of the fact that in the operation of its water plant it is engaged in the discharge of a sacred trust in behalf of the beneficiaries thereof, the people of the portion of the city which is served from the water system. It is contended, in effect, that because of this circumstance South Pasadena was entitled to special consideration at the hands of the city council of San Gabriel when the former city asked for the permit we have so often mentioned. We think the circumstance leads to the contrary conclusion. San Gabriel, too, is engaged in the administration of a trust, that of protecting

its people from dangers to their health, comfort and general welfare. San Gabriel is not concerned with the trust with which South Pasadena burdened itself when it embarked in the conduct of the water business, if the execution of the latter trust improperly impinges upon the rights of the people of San Gabriel. When South Pasadena asked the permit from the city council of San Gabriel, no matter how honestly that request was made, no matter how badly South Pasadena required an augmentation of its water supply, the latter city asked too much. Under the law South Pasadena could not levy such a tribute upon San Gabriel as would have been paid if the permit had been granted. To grant the permit would have been to impose upon San Gabriel no inconsiderable portion of the burden which rests upon South Pasadena as a purveyor of water to a portion of its territory. The city council of San Gabriel was amply justified in refusing the permit.

At the back of the above discussion lies the rule that official duty is presumed to have been correctly performed, as well as the rule that where, in such instances as that which presented itself to the city council of San Gabriel, there is a question upon which minds may differ—a conflict of evidence—the decision of the body concerned cannot be disturbed. But there is little reason to invoke these rules, after all, as we fail to perceive how the city council of San Gabriel could properly have granted the requested permit.

South Pasadena contends that various errors were committed by the trial court during the progress of the proceeding there. The conclusions we have reached upon the points above discussed make it unnecessary to consider these claims. The procedural delinquencies of the trial tribunal, if any there were, are no longer matters of interest. The outcome of the proceeding was settled before ever it came before the courts.

In addition to its appeal from the judgment South Pasadena also appeals from an order of the trial court denying its motion for another and different judgment on the findings.

Judgment and order affirmed.

Craig, J., concurred.

STEPHENS, J., Dissenting.—I dissent.

The supply of water for the rapidly increasing population of the highly favored section of territory that embraces both of the litigating cities is of the highest importance and should be given the most serious consideration. The site of the proposed well is very close to the boundary of San Gabriel and piping across this territory would be no more than a trivial and temporary inconvenience to anybody. The city lot owned by South Pasadena, the site of the proposed well, is, and so are all of the surrounding lots, much larger than the ordinary city residential lot. It is proposed to place all power current cables and all structures beneath the surface of the ground and it is apparent that the site would yield readily to beautification through parking, striking examples of which may be found in this county. The sinking of the well and all of the construction work would scarcely be more noisy or otherwise objectionable than the erection of a first-class residence. The evidence and the ordinary knowledge extant on the science of electrical pumping show that the operating noise would be unnoticeable a few yards from the pump. The periodical removal of sand by means of a temporary derrick no higher than an ordinary fruit-tree would seem to furnish no element of danger to the health, safety or welfare of the neighborhood. It is undoubtedly true that pumping plants can be objectionable, but there is nothing inherently or incurably objectionable about them. It may be that the two or three plants in the vicinity have been and now are objectionable. A residence may be objectionable and so may a ragged vacant lot be objectionable. With the proposed plant out of sight and out of hearing, and with the site beautified it would seem a more logical procedure to profit by the example of a properly regulated and restricted plant than to stop progress by a prohibitory order. Rather than one municipality being compelled unrighteously to bear the burden of another, as the majority opinion indicates would be the case if the well were sunk, I think the sinking of the well and the maintenance of the pumping plant under proper and strict regulation would create no burden but would show the way for the elimination of present burdens. The broader and truer vision is that the prosperity of South Pasadena would

also aid the prosperity of its neighbor, San Gabriel, as an adequate water supply for each is essential to the general prosperity of the whole section of which these two cities are a part.

It should be borne in mind that there is no issue of water ownership or of so-called water rights in the case.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on November 27, 1933.

Shenk, J., dissented.