[No. E020294. Fourth Dist., Div. Two. July 15, 1998.]

COUNTY OF RIVERSIDE, Plaintiff and Respondent, v.
CITY OF MURRIETA et al., Defendants and Appellants.

**COUNSEL**

Harper & Burns and John R. Harper for Defendants and Appellants.

William C. Katzenstein, County Counsel, Lee A. Vinocour, Deputy County Counsel, McDermott, Will & Emery, George L. Hampton IV and Tambra Raush for Plaintiff and Respondent.

**OPINION**

**GAUT, J.—**

### 1. *Introduction*

On July 19, 1994, pursuant to the Community Redevelopment Law, section 33000 et seq. of the Health and Safety Code,[1] the Murrieta City Council adopted Ordinance No. 121 approving a redevelopment project involving 3,788.19 acres of land. Subsequently, 200 acres of vacant county land were eliminated from the project area, thus reducing the amount of

---

[1] All further statutory references are to the Health and Safety Code unless otherwise stated.

property affected to 3,588.19 acres. The project is generally located in the area of the juncture of Interstates 15 and 215 in Riverside County.

The County of Riverside (County) filed a superior court action challenging the City of Murrieta's (City) approval of the project on a number of grounds. The trial court reviewed the administrative record and issued a statement of decision granting judgment in favor of the County on the grounds that the record did not contain substantial evidence to support the City's findings that the project area is a "predominantly urbanized area . . . which is a blighted area." (§ 33320.1, subd. (a).)

The City has appealed arguing that the trial court erred in finding no substantial evidence to support the City's determination that the project area is both predominantly urbanized and blighted. We conclude that the trial court correctly found there is no substantial evidence that the project area is either predominantly urbanized or blighted.

## 2. *Standard of Review*

■ Both parties agree that it was correct for the trial court to apply the substantial evidence test in reviewing the City's determination that the project area was predominantly urbanized and blighted. (*In re Redevelopment Plan for Bunker Hill* (1964) 61 Cal.2d 21, 39-41 [37 Cal.Rptr. 74, 389 P.2d 538].) The parties disagree, however, regarding what the proper standard of review is for an appellate court reviewing the decision of a trial court made in accordance with the substantial evidence test. The County articulates the standard of review as follows: "Rather than requiring the County to show on appeal that there was no substantial evidence supporting the City's determination of urbanization and blight, the County need only show that there was substantial evidence to support the trial court's decision in the County's favor." In contrast, the City argues that the test is not "whether the Trial Court's decision was supported by '*substantial evidence*', but instead . . . whether, upon examination of the Administrative Record as a whole, substantial evidence exists to support the City Council's decision."

The distinction is somewhat elusive between whether substantial evidence supports the City's determination or whether substantial evidence supports the trial court's finding that there is no substantial evidence to support the City's determination. Several cases involving appellate review under the redevelopment law each treat the issue slightly differently.

In *Bunker Hill*, after stating that the trial court should apply the substantial evidence rule when reviewing a redevelopment decision, the California Supreme Court did not expressly state the applicable standard of appellate

review, but it affirmed the trial court's decision that substantial evidence existed, holding that the trial court's decision was supported by the record. (*In re Redevelopment Plan for Bunker Hill, supra,* 61 Cal.2d at pp. 39-41, 45-50.)

Subsequently, in *Sweetwater Valley Civic Assn.* v. *City of National City* (1976) 18 Cal.3d 270 [133 Cal.Rptr. 859, 555 P.2d 1099], in a brief opinion, the Supreme Court reversed the trial court's finding that substantial evidence supported the city's redevelopment decision. The *Sweetwater* court did not discuss the appellate standard of review but it expressly held there was no substantial evidence to support the city's determination and it implicitly rejected the trial court's affirmation of the city's determination.

Finally, in *Regus* v. *City of Baldwin Park* (1977) 70 Cal.App.3d 968, 975 [139 Cal.Rptr. 196], the court stated: "We evaluate the administrative findings in accordance with the substantial evidence rule applicable to judicial review of a redevelopment project. [Citations.] The critical issue is whether the Project area is a blighted area." The *Regus* court then engaged in a detailed analysis of the administrative record without referring to the trial court's decision. *Regus* held there was no substantial evidence of blight, thus contradicting the City's determination and reversing the trial court's judgment.

We acknowledge the general rule that an appellate court must affirm the decision of a trial court if, after resolving all evidentiary conflicts and indulging all reasonable inferences in support of the judgment, there is substantial evidence to support it. (*Pennel* v. *Pond Union School Dist.* (1973) 29 Cal.App.3d 832, 837 [105 Cal.Rptr. 817]; *Kuhn* v. *Department of General Services* (1994) 22 Cal.App.4th 1627, 1632-1633 [29 Cal.Rptr.2d 191].) But we do not simply echo the trial court: "The ultimate determination is whether a *reasonable* trier of fact could have found for the respondent [City] based on the *whole* record." (*Kuhn* v. *Department of General Services, supra,* 22 Cal.App.4th at p. 1633.)

From the foregoing, we conclude that the proper standard of review requires us to decide whether substantial evidence supports the judgment of the trial court regarding the City's two ultimate determinations in this case: 1) that the project area is predominantly urbanized, and 2) that the project area is blighted. We find no substantial evidence of either and thus uphold the judgment.

### 3. *Predominantly Urbanized*

In order to qualify as a redevelopment project area, section 33320.1 requires that the project area be predominantly urbanized, which in turn

means that 80 percent of the land must be developed for urban uses.[2] The parties argue that project area is predominantly urbanized in various percentages ranging from 4.8 percent to 90 percent. The trial court found that the evidence showed that only 65.7 percent of the project area can be characterized as predominantly urbanized.

The difficulty with this issue is that the meaning of "urban," and hence "predominantly urbanized," is unsettled. In the case of *Honey Springs Homeowners Assn.* v. *Board of Supervisors* (1984) 157 Cal.App.3d 1122, 1138-1142 [203 Cal.Rptr. 886], Division One of the Court of Appeal, Fourth Appellate District, attempted to define the meaning of "urban development" under the Government Code. The court first resorted to dictionary definitions from Webster's and Black's for the somewhat circular explanation that urban means of or relating to a city, a definition also adopted in *South Pasadena* v. *San Gabriel* (1933) 134 Cal.App. 403, 409-410 [25 P.2d 516].

The *Honey Springs* court then referred to hoary Pennsylvania case law from 1896 for a more functional definition: " ' "Whether the particular property . . . is to be considered 'rural' or 'city', depends largely upon its surroundings and the character of the property in the neighborhood. If the buildings and improvements in the neighborhood are few and scattered; they partake of the character of the country, rather than of the city or town, and are occupied by persons engaged in rural pursuits—the locality should be considered rural. On the other hand, if the houses and improvements partake of the character of the city or town, and are mainly occupied by persons engaged in city pursuits, the locality should be considered as city and not

---

[2]Section 33320.1 reads:

"(a) 'Project area' means, except as provided in Section 33320.2, 33320.3, 33320.4, or 33492.3, a predominantly urbanized area of a community which is a blighted area, the redevelopment of which is necessary to effectuate the public purposes declared in this part, and which is selected by the planning commission pursuant to Section 33322.

"(b) As used in this section, 'predominantly urbanized' means that not less than 80 percent of the land in the project area:

"(1) Has been or is developed for urban uses; or

"(2) Is characterized by the condition described in paragraph (4) of subdivision (a) of Section 33031; or

"(3) Is an integral part of one or more areas developed for urban uses which are surrounded or substantially surrounded by parcels which have been or are developed for urban uses. Parcels separated by only an improved right-of-way shall be deemed adjacent for the purpose of this subdivision.

"(c) For the purposes of this section, a parcel of property as shown on the official maps of the county assessor is developed if that parcel is developed in a manner which is either consistent with zoning or is otherwise permitted under law.

"(d) The requirement that a project be predominantly urbanized shall apply only to a project area for which a final redevelopment plan is adopted on or after January 1, 1984, or to an area which is added to a project area by an amendment to a redevelopment plan, which amendment is adopted on or after January 1, 1984."

rural. A locality which is laid out in small lots, of the usual size for city or town lots and partly built upon with city improvements, such as paved streets and gas or water pipes, should be considered in the class of city property." ' " (*Honey Springs Homeowners Assn.* v. *Board of Supervisors, supra,* 157 Cal.App.3d at pp. 1140-1141, citing *City of McKeesport* v. *Soles* (1896) 178 Pa. 363 [35 A. 927, 929-930].)

For another kind of functional definition, *Honey Springs* also looked at federal law: "Title 42 of the United States Code, section 1500d-1 regarding public health and welfare in the preservation of open-space land, defines 'urban area' as: 'any area which is urban in character, including those surrounding areas which, in the judgment of the Secretary, form an economic and socially related region, taking into consideration such factors as present and future population trends and patterns of urban growth, location of transportation facilities and systems, and distribution of industrial, commercial, residential, governmental, institutional, and other activities.' " (*Honey Springs Homeowners Assn.* v. *Board of Supervisors, supra,* 157 Cal.App.3d at p. 1141.)

The *Honey Springs* court further observed that the distinction between urban and rural has blurred over the years "because inhabitants of many rural locations now enjoy (indeed expect) available transportation, light, power, water and sanitary facilities and services, just as their counterparts in urban centers. [Citation.]" (*Honey Springs Homeowners Assn.* v. *Board of Supervisors, supra,* 157 Cal.App.3d at p. 1141.)

The *Honey Springs* court finally concluded that "the descriptive term 'urban' . . . has no fixed, objective and easily ascertainable meaning . . . ." (*Honey Springs Homeowners Assn.* v. *Board of Supervisors, supra,* 157 Cal.App.3d at p. 1141.) Instead, "[w]hether a residential development is urban or rural therefore, must be determined by evaluating factors relating to the varying characteristics of individual projects." (*Ibid.*) Among the many factors considered probative by the *Honey Springs* court included: ". . . density, surrounding development, proximity to or potential of becoming an incorporated area, existing public facilities, water availability in the region, steepness of natural slope, minimum parcel sizes, availability of public transit, ability to cluster housing to preserve open space, height of buildings, on-site sewage capacity, landscaping, lighting, space between structures, proximity of employment centers, preservation of open space easements, size of area to be served by commercial facilities, the attractiveness of commercial facilities to regional travelers, . . . the size of signs. . . . [¶] . . . lot size, length and width of paved streets, amount of traffic generated, presence of commercial or industrial development, presence of urban infractures (i.e., public water supply, sewer, fire, police, schools, and attendant

facilities), and the general impact of the proposed development on . . . scenic, recreational, wildlife or agricultural values . . . ." (*Id.* at pp. 1141-1142.)

The dissent in *Honey Creek* cautioned against the courts deciding the meaning of urban and rural: "What the planning commission and board of supervisors find to be 'urban' or 'rural' may not be quite the same in Sierra, Shasta, or Siskiyou as in San Francisco, Sacramento or San Diego. . . .

"I would suggest the court should refrain from defining 'urban' or 'rural' in different terms or by different standards . . . . Even though some judges might have backgrounds in local agency law or land-use regulation, that is not the qualification of office or the profession of the courts. The particular decisions about what is 'rural' or 'urban' in particular counties is, in the area of land use, left, and properly so, to different planning commissions and boards of supervisors rather than to different courts." (*Honey Springs Home-owners Assn.* v. *Board of Supervisors, supra,* 157 Cal.App.3d at pp. 1152-1153 (dis. opn. of Lewis, J.).)

We are persuaded by the *Honey Springs* court that the meaning of urban is not fixed, objective, or easily ascertainable. Heeding the *Honey Springs* dissent, we also decline to render a judicial definition of urban. But even without settling on a precise definition, we still agree with the trial court's finding of lack of substantial evidence. Even if we defer to the definitions employed by the City's land use categories, there is a paucity of evidence in the administrative record to support a determination that the project area is predominantly urbanized.

In the present case, the City determined that 81 percent of the original project area of 3,788.19 acres was developed for urban uses. The City relied solely upon a one-page table in which existing land uses were divided into urban and nonurban uses. (See appen. A for a photocopy of the table, *post,* at p. 630.) Only agricultural and vacant land were classified as nonurban uses. Included as urban uses were two categories of residential land use as defined by the City's general plan, rural-residential and equestrian-residential, total-ing 596.47 acres.[3] The category of rural-residential has a minimum lot size of 2.5 acres. The category of equestrian-residential has a minimum lot size of .5 acres. Both categories allow horses, other livestock, and other agricul-tural uses.

Upon review, the trial court decided that the rural- and equestrian-residen-tial uses did not reasonably qualify as "urban" uses. Therefore, only 65.7

---

[3] The category of rural-residential contained 208.47 acres. The category of equestrian-residential contained 388 acres.

percent of the project area was developed for urban uses. Even if 200 acres of vacant land is eliminated from the project area, under the trial court's analysis, only 69.4 percent of the project qualifies as land developed for urban use. Hence the trial court found that no substantial evidence exists to support the City's determination that 81 percent of the project area was developed for urban uses.

As set forth in *Honey Springs*, a multitude of factors bear on the question of whether property is urban or rural. Virtually none of these factors were identified or considered by the City when it concluded that the project area was predominantly urban. Furthermore, the City did not offer any reason for including low-density residential property that is also used for farming and animal husbandry, activities commonly associated with rural rather than urban living, in the category of urban uses. No substantial evidence exists to support the City's conclusion that the project area was predominantly urbanized. The true basis for the City's determination seems to be simply that it was economically advantageous to characterize the project area as predominantly urbanized. (See *Lancaster Redevelopment Agency* v. *Dibley* (1993) 20 Cal.App.4th 1656, 1658 [25 Cal.Rptr.2d 593].)

At trial, the City argued that any property developed in accordance with zoning regulations or other law is considered "developed for urban uses." (§ 33320.1, subds. (b)(1) and (c).) By that definition, any property except vacant land could qualify as urban. The trial court quite reasonably rejected this argument. We agree with the findings of the trial court on this issue.

### 4. *Blight*

Unless the project area is both predominantly urbanized and blighted, it cannot be selected for redevelopment. We also agree with the trial court's finding that no substantial evidence supported the City's determination that the project area is blighted.

The physical and economic conditions demonstrating the existence of blight are set forth in sections 33030 and 33031.[4] In summary, an area is blighted, and hence eligible for redevelopment, if it is predominantly urban

---

[4]Section 33030 states:

"(a) It is found and declared that there exist in many communities blighted areas which constitute physical and economic liabilities, requiring redevelopment in the interest of the health, safety, and general welfare of the people of these communities and of the state.

"(b) A blighted area is one that contains both of the following:

"(1) An area that is predominantly urbanized, as that term is defined in Section 33320.1, and is an area in which the combination of conditions set forth in Section 33031 is so prevalent and so substantial that it causes a reduction of, or lack of, proper utilization of the area to such an extent that it constitutes a serious physical and economic burden on the

and if it is adversely affected by economic and physical conditions too serious to be cured by private or governmental enterprise, thus necessitating redevelopment. The general nature of the adverse conditions contributing to blight involve unsafe or unhealthy buildings or property that is not economically viable; incompatible uses; irregular lots; depressed property values, including property containing hazardous waste; high business vacancies and unprofitable commercial tenancies; lack of necessary commercial facilities; residential overcrowding; undesirable adults-only businesses; and a high crime rate. Additionally, a blighted area may also suffer from an inadequate infrastructure.

The redevelopment report prepared by the Murrieta Redevelopment Agency purported to identify various conditions demonstrating blight. The report stated that there had been 45 serious building and safety code violations during the year of 1993 (and 118 less serious property maintenance

---

community which cannot reasonably be expected to be reversed or alleviated by private enterprise or governmental action, or both, without redevelopment.

"(2) An area that is characterized by either of the following:

"(A) One or more conditions set forth in any paragraph of subdivision (a) of Section 33031 and one or more conditions set forth in any paragraph of subdivision (b) of Section 33031.

"(B) The condition described in paragraph (4) of subdivision (a) of Section 33031.

"(c) A blighted area also may be one that contains the conditions described in subdivision (b) and is, in addition, characterized by the existence of inadequate public improvements, parking facilities, or utilities."

Section 33031 states:

"(a) This subdivision describes physical conditions that cause blight:

"(1) Buildings in which it is unsafe or unhealthy for persons to live or work. These conditions can be caused by serious building code violations, dilapidation and deterioration, defective design or physical construction, faulty or inadequate utilities, or other similar factors.

"(2) Factors that prevent or substantially hinder the economically viable use or capacity of buildings or lots. This condition can be caused by a substandard design, inadequate size given present standards and market conditions, lack of parking, or other similar factors.

"(3) Adjacent or nearby uses that are incompatible with each other and which prevent the economic development of those parcels or other portions of the project area.

"(4) The existence of subdivided lots of irregular form and shape and inadequate size for proper usefulness and development that are in multiple ownership.

"(b) This subdivision describes economic conditions that cause blight:

"(1) Depreciated or stagnant property values or impaired investments, including, but not necessarily limited to, those properties containing hazardous wastes that require the use of agency authority as specified in Article 12.5 (commencing with Section 33459).

"(2) Abnormally high business vacancies, abnormally low lease rates, high turnover rates, abandoned buildings, or excessive vacant lots within an area developed for urban use and served by utilities.

"(3) A lack of necessary commercial facilities that are normally found in neighborhoods, including grocery stores, drug stores, and banks and other lending institutions.

"(4) Residential overcrowding or an excess of bars, liquor stores, or other businesses that cater exclusively to adults, that has led to problems of public safety and welfare.

"(5) A high crime rate that constitutes a serious threat to the public safety and welfare."

violations.) Additionally, when 1,100 structures were surveyed, 41 structures were identified as unsafe or unhealthy. The report generally described other kinds of deficiencies that were either cosmetic, less serious, or the result of age, obsolescence, or nonstandard, nonconforming or incompatible uses. These deficiencies were exhibited in 30 photographs of the project area. The report also generally identified problems with the traffic circulation system, flooding, and irregular plot sizes, particularly that created by the construction of the Interstate 15 and Interstate 215 junction.

As indications of economic blight, the report again pointed generally to the negative effects caused by an inadequate traffic system and flooding and also commented on the inadequacy of the system of utilities to meet the demands of urban rather than rural development. The report also acknowledged that the project area, although claimed to be urbanized, had been developed in a manner "much less intense than would be economically viable today" for urban use. The report identified two hazardous waste sites and thirty-five potentially hazardous sites, primarily automobile-related businesses and dry cleaners. The report also claimed unreasonably low taxable sales for Murrieta and inadequate parking in some commercial and industrial areas. The proposed cost of the redevelopment project was projected to be $185,091,900.

The County objected on several grounds to the City's failure to prove blight. It argued that only 4.5 percent of the surveyed structures could be characterized as unsafe and that the properties in the project were worth more than the City was willing to recognize. The County also pointed to the absence of specific data to support the report's general comments about design, construction, age, obsolescence, and incompatibility of land uses. Additionally, the County contested the report's characterization of the problems with flooding and irregular plot sizes. Finally, the County strenuously asserted the City had not proved that the project area could not be assisted by either private or governmental enterprise rather than by redevelopment.

In its statement of decision, the trial court held that the evidence of physical blight was either slight or not supported by specific evidence. Additionally, the economic evidence of blight was not quantified and not shown to constitute a serious physical or economic burden on the community.

We have reviewed the administrative record and we agree with the trial court's evaluation. The City accuses the County of offering no controverting evidence and the trial court of impermissibly reweighing the evidence. But after sifting through the general commentary that comprises much of the

redevelopment report, we discover there is little substantive material to be gleaned. Although the report speaks in the statutory language used to define blight, the report offers little concrete evidence of actual conditions of blight.

Instead the report identifies fewer than 5 percent of the project area's structures as belonging in the category of unsafe or unhealthy. In commenting on this factor, the Legislative Analyst's Office said: "According to the State Department of Housing and Community Development, this rate of building deficiency is *lower* than exhibited in most California communities." (Legis. Analyst's Off., Redevelopment After Reform: A Preliminary Look (Dec. 29, 1994) pp. 15-17.)

The rest of the conditions of physical blight are not supported by tangible proof and are not discussed in a meaningful way. An example of the kind of jargon used in the report is the following: "Functional obsolescence is a condition resulting from changes in modern building practices and the manner in which buildings are utilized. As the building stock ages, its structural components and configurations become unable to meet the expectation and needs of users. This suppresses value and rental income which in turn produces a lower level of physical maintenance at a time when the structures are literally wearing out."

In other words, buildings age and become less valuable. But the foregoing does not show the existence of blight in the City. The report makes little attempt to describe specific problems caused by older buildings or to estimate the cost of remedying those problems.

Similarly, the report generally discusses economic conditions without quantifying loss of property value. Instead, the report points to low taxable sales without linking those to blighting conditions. Only two hazardous waste sites are identified and the degree of contamination is not described. The bald claim of inadequate parking is also not supported.

■ In reviewing whether substantial evidence exists, the cases say: " 'Substantial' evidence means that evidence must be of 'ponderable legal significance.' It must be 'reasonable in nature, credible, and of solid value.' [Citations.]" (*Pennel* v. *Pond Union School Dist., supra,* 29 Cal.App.3d at p. 837, fn. 2.) ■ The trial correctly found that no substantial evidence of blight is present here.

True blight is expressed by the kind of dire inner-city slum conditions described in the *Bunker Hill* case: unacceptable living conditions of 82 percent; unacceptable building conditions of 76 percent; crime rate of double

the city's average; arrest rate of eight times the city's average; fire rate of nine times the city's average; and the cost of city services more than seven times the cost of tax revenues. (*In re Redevelopment Plan for Bunker Hill, supra,* 61 Cal.2d at p. 45.)

Another case in which blight was exemplified is *Morgan* v. *Community Redevelopment Agency* (1991) 231 Cal.App.3d 243 [284 Cal.Rptr. 745]. Blighted conditions in *Morgan* included: unacceptable building conditions of 63 percent, including 25 percent seismically unsafe commercial buildings; overcrowded housing; incompatible adjacent adult-entertainment and industrial uses; no recreational uses; transient rentals; high crime rate; large homeless and runaway population; depreciating property values; and no likelihood of private development and investment.

Even more recently, a court has required combined evidence of overcrowding, dilapidated structures, and an elevated crime rate to show blight. (*Gonzales* v. *City of Santa Ana* (1993) 12 Cal.App.4th 1335, 1345 [16 Cal.Rptr.2d 132].)

In comparison, the project area in the present case has been depicted as a rural and formerly rural area beginning to be developed in spite of some minor deficiencies in the infrastructure. No problems with crime and no significant other problems have been demonstrated. The City has not managed to make a preliminary showing of blight. We therefore uphold the trial court's judgment rejecting the City's determination of the project area as blighted.

### 5. *Attorney's Fees and Costs*

In a cross-appeal, the County protests the decision of the trial court to deny it attorney's fees and costs of $5,205.48.

The County seeks an award of attorney's fees under the substantial benefits doctrine, relying on *Card* v. *Community Redevelopment Agency* (1976) 61 Cal.App.3d 570, 582-583 [131 Cal.Rptr. 153].) The substantial benefits doctrine permits a discretionary award of attorney's fees to be made "when a litigant, suing in a representative capacity, obtains a decision resulting in the conferral of a substantial, actual and concrete, pecuniary or nonpecuniary benefit on the members of an ascertainable class, and the court's jurisdiction over the subject matter makes possible an award that will spread the costs proportionately among the members." (*Save El Toro Assn.* v. *Days* (1979) 98 Cal.App.3d 544, 548 [159 Cal.Rptr. 577].)

In *Card,* a group of in personam taxpayers successfully challenged a city ordinance purporting to amend an existing redevelopment plan. The court

invalidated the ordinance and made an award of fees in favor of the taxpayer plaintiffs. The fee award was not made against the defendant redevelopment agency but against the taxing agencies whose shares of the tax increment funds otherwise would have gone to the redevelopment agency; the court said: "This result substantially benefits the affected taxing agencies, named in the judgment (and through them their taxpayers), since it reduces both the occasion for the Agency's expenditure of such funds and the Agency's source of such funds as well. A taxpayers' suit is by its very nature a representative action. [Citation.] Accordingly, we hold that the award of attorneys' fees made in this case to plaintiffs' counsel was authorized under the substantial benefit doctrine. [Citation.]" (*Card* v. *Community Redevelopment Agency, supra,* 61 Cal.App.3d at p. 583.)

The *Card* case does not apply here because the County is not like the taxpayer plaintiffs in that case. Instead, the County is like the taxing agencies and, like them, the County should be responsible for the fees incurred in preserving its share of the tax increment funds. It was not an abuse of discretion for the trial court to deny the County's request for fees.

■ We also reject the County's argument that the court erred in not awarding the County its costs for blowups and photocopies as authorized by Code of Civil Procedure section 1033.5, subdivision (a)(12). The statute permits recovery of such costs only if the items "were reasonably helpful to aid the trier of fact." The trial court expressly determined that these items were not reasonably helpful. The trial court did not abuse its discretion in denying the County the recovery of these costs. (*Science Applications Internat. Corp.* v. *Superior Court* (1995) 39 Cal.App.4th 1095, 1103-1104 [46 Cal.Rptr.2d 332].)

### 6. *Disposition*

We affirm the judgment. The parties shall bear their own costs on appeal.

McKinster, Acting P. J., and Richli, J., concurred.

APPENDIX A

| TABLE 1<br>PROJECT AREA<br>EXISTING LAND USES | | |
|---|---|---|
| Land Use | Number<br>of Acres | Percent of<br>Project Area |
| **URBANIZED** | | |
| Residential | 1,274.69 | 33.7 |
| Commercial | 457.05 | 12.1 |
| Industrial | 227.09 | 6.0 |
| Resort | 41.61 | 1.1 |
| Public/Institutional/Airport | 81.89 | 2.1 |
| Quasi-Public | 4.67 | 0.1 |
| Previously Urbanized | 355.54 | 9.4 |
| Rights-of-Way<br>(Streets, Flood Control, Railroad) | 618.48 | 16.3 |
| Creek/Open Space | 24.42 | 0.6 |
| **NOT DEVELOPED FOR URBAN USES** | | |
| Agriculture/Farmland | 106.89 | 2.8 |
| Previously Agricultural | 21.87 | 0.6 |
| Unimproved | 573.99 | 15.2 |
| **TOTAL** | 3,788.19 | 100.0% |

Source: Urban Futures, Inc. 1994